895 A.2d 382

Harold Wayne ELLER, Sr.

v.

Wilbur W. BOLTON, III, Personal Representative
of the Estate of Virginia Denton Eller.

No. 692 Sept. Term, 2004.

Court of Special Appeals of Maryland.

March 31, 2006.

98

Mercedes C. Samborsky, Joppatown, for Appellant.

John J. Condliffe, Towson, for Appellee.

Panel: MURPHY, C.J., KENNEY and LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

KENNEY, Judge.

Harold Wayne Eller ("Husband") appeals the judgment of the Circuit Court for Harford County, amending a Qualified Domestic Relations Order ("QDRO") issued by that court as a

Domestic Relations Order ("DRO") on March 13, 2001. The amendments removed language terminating the interest of Virginia Denton Eller ("Wife") in a portion of Husband's pension benefits upon her death. In addition, the amended QDRO designated Wife as "the alternate payee through Wilbur S. Bolton, III, Personal Representative of the Estate of [Wife]." Husband presents one question for our review, which we have divided and recast as the following:

I. Did the circuit court have the authority to amend a QDRO in order to secure Wife's marital property award in accordance with a Consent Order that was incorporated, but not merged, into the judgment of divorce?

II. Is the QDRO, as amended, invalid under 29 U.S.C. § 1056(D)(3)(K) because it provides for payment to an individual not included within the definition of an "alternate payee?"

We answer the first question in the affirmative, but because the domestic relations order, as amended, may not be qualifiable, we shall vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

Husband and Wife were married on December 11, 1961. They separated on May 11, 1997, and on July 20, 1998, Husband filed a complaint for absolute divorce in the Circuit Court for Harford County. In her counter-complaint for absolute divorce, Wife sought, among other things, alimony, child support, and a monetary award pursuant to Maryland Code (1984, 1999 Repl.Vol.), § 8-205-208 of the Family Law Article ("F.L.").

On June 27, 2000, the circuit court approved a consent order executed by Husband and Wife (the "Consent Order"). In consideration of Wife's waiver of any right to a monetary award, alimony, and attorneys' fees, Husband assigned to Wife, among other things, one-half of his interest in the

Robert Preston Excavating Co., Inc., Profit Sharing Plan and Trust (the "Plan"). The Plan is identified as a defined contribution plan.[1]

Husband and Wife covenanted, in pertinent part:

L. The Plan Administrator for [Husband's] interest in the [Plan], shall distribute directly to [Wife], *by way of a rollover to her designated plan,* 50% of the total value in the Plan, not to exceed 1/2 of $50,000 as indicated on Statement of Account for Plan dated 12/31/99, copy attached as Ex. 1.

M. [Husband] assigns to [Wife] one-third (1/3) of the preretirement death benefits, not to exceed 1/3 of $126,000.00 as indicated on Ex. 1, but a lesser amount if value of said pre-retirement death benefit has decreased at the time of [Husband's] death.

N. [Husband] assigns to [Wife] one-third (1/3) of the proceeds from life insurance benefits incident to the Plan, not to exceed 1/3 of $76,000.00 as indicated on Ex. 1, but a lesser amount if value of said insurance death benefit has decreased at the time of plaintiff's death.

O. [Husband] shall not do nor suffer to be done any act, except as herein set forth, to decrease the value of his said pre-retirement death benefit or the value of the life insurance proceeds either by way of requesting disbursement thereof, by assignment, or by loan against such benefits.

---

1. A defined contribution plan is one in which an individual account is maintained for each participant, to which the employer periodically contributes specified amounts. *Rosenberg v. Rosenberg,* 64 Md.App. 487, 504–05, 497 A.2d 485 (1985). Earnings and losses from the plan's investment activities are allocated to each participant's account. *Id.* at 505, 497 A.2d 485. Upon retirement, each participant receives a lump sum payment equal to the cumulative value of his or her share. *Id.* A defined contribution plan is distinguishable from a defined benefit plan. In the latter, a separate account is not maintained for each employee and contributions to the plan for each participant are specified in advance, typically as a percentage of the participants' salaries. *Id. See also generally,* David Clayton Carrad, *The Complete QDRO Handbook, Dividing ERISA, Military, and Civil Service Pensions and Collecting Child Support from Employee Benefit Plans,* 15–17 (2nd ed. 2004).

P. [Wife's] attorney shall draft the Qualified Domestic Relations Orders necessary to distribute the pension plan benefits *as herein indicated*[.]

(Emphasis added.)

On March 9, 2001, the circuit court granted Husband an absolute divorce. The court incorporated, but did not merge, the Consent Order in its judgment of divorce. Furthermore, in granting the divorce, the court ordered:

[T]his Court shall retain jurisdiction over the matter of the pension for purposes of securing a Qualified Domestic Relations Order to protect said [Wife's] monetary award, and to retain jurisdiction to amend[ ] this Judgment and/or the aforesaid Qualified Domestic Relations Order for the purpose of maintaining its qualifications as a qualified domestic relations order under the Retirement Equity Act of 1984, or any other subsequent legislation; and both parties and the manager of [Husband's] retirement plan shall take whatever actions may be necessary to establish or maintain these qualifications, provided that no such amendment shall require the retirement plan to provide any type or form of benefits, or any option not otherwise provided under the [P]lan, and further provided that no such amendment or the right of the Court to so amend will invalidate the order as "Qualified" under the Retirement Act.

On March 13, 2001, the circuit court signed a domestic relations order ("DRO"), which was "consent[ed][to] as to form" by counsel for both Husband and Wife. The DRO included the name and address of Husband, the plan participant, and the name and address of Wife, the alternate payee. Additionally, the DRO provided:

(3) The Plan Administrator for [Husband's] interest in the [Plan], shall distribute, directly to [Wife], by way of a rollover to her designated plan, Fifty Percent (50%) of the total value in the Plan, not to exceed one-half (½) of Fifty Thousand Dollars ($50,000.00) as indicated on Statement of Account for Plan dated December 31, 1999, copy attached as Exhibit No. 1, when, if, and as paid to [Husband.]

* * *

(6) The [Plan], from which benefits are assigned herein-above, including both Company Accounts and Voluntary Accounts of the Participant under the Profit Sharing Plan & Trust, will pay benefits to [Wife] in accordance with the provisions of Annotated Code of Maryland, Family Law Article Section 8–205 (Cumm. Supp. 1990) and based on the following formula. [Wife] is hereby assigned Fifty Percent (50%) of the total value of [Husband's] profit sharing plan & trust account (not to exceed ½ of $50,000.00), which he has earned through his employment with Robert Preston Excavating Co., Inc., said Fifty Percent (50%) interest to be calculated as of December 31, 1999. [Husband] assigns to [Wife], 50% of assets of account as of December 31, 1999 (not to exceed $50,000.00, in value), plus all accretions and losses attributable to [Wife's] 50%, rolled over into a separate account for [Wife]. . . .

* * *

(7) [Wife] shall commence her portion of the benefit plan when eligible in accordance with the Plan. Payments will continue until [Wife's] death.

(8) [Husband], [Wife], and the [c]ourt, intend this Order to be a Qualified Domestic Relations Order as defined in Section 414(p) of the Internal Revenue Code of 1986 as amended.

(9) This Order is issued pursuant to the Family Law Article of the Annotated Code of Maryland which relates to the provisions of child support, alimony payments, or marital property rights as defined therein between spouses and former spouses in actions for divorce.

* * *

(13) The parties agree that their mutual intent is to provide the Alternate Payee [Wife] with a retirement payment that fairly represents a marital share of the retirement before as defined herein. If this Order submitted to the Administrator of the Plan is held not to be a Qualified Domestic Relations Order within the meaning of IRC Section 414(p),

the parties permit this Court to retain jurisdiction over this matter and they further agree to request this [c]ourt to modify the Order so as to make it a Qualified Domestic Relations Order that reflects the parties' intent, said modification order to be entered *nunc pro tunc*, if appropriate.

Although the Plan administrator initially accepted, and presumably "qualified," the proposed DRO (the "original QDRO"), several problems soon became apparent. The original QDRO was unclear whether Wife's benefits were to be distributed through a single lump sum payment. The Plan administrator also determined that the pre-retirement death benefit figure of $126,000 in the Consent Order was inaccurate. According to the Plan administrator, Husband's interest should have been stated as $76,000. Finally, the Plan noted that, as the original QDRO was drafted, the Plan could not pay Wife the death benefit because the provision of the Consent Order granting Wife such an interest was not included.

It appears that, in response, Husband and Wife agreed to amend the original QDRO to address the Plan administrator's concerns, and that a revised DRO was drafted (the "Revised DRO"), but was never approved by the circuit court.[2] It is unclear from the record whether it was actually submitted to the circuit court, but, according to the Plan's complaint in the subsequent interpleader action, the Revised DRO was submitted to the Plan.

On September 18, 2001, before Husband became eligible for benefits under the Plan and before Wife had returned required distribution request forms to the Plan, Wife died. When Husband subsequently became eligible for benefits, Husband and Wife's estate ("the Estate") filed competing claims. Uncertain as to which party or parties it should pay and whether it should honor the original QDRO or the Re-

---

**2.** The information relating to the proceedings occurring after the entry of divorce is gleaned from the Plan's pleading in the interpleader action and from the District Court's opinion in that case, which are included in the record and joint record extract.

vised DRO, the Plan filed an interpleader action in the United States District Court for the District of Maryland, Civil Action number WMN–02–0077, naming Husband and the Estate as defendants. After the District Court realigned the parties, Husband, as plaintiff, filed a motion for summary judgment, asserting that Wife was not entitled to benefits under the original QDRO, the only order approved by the circuit court, because payments to Wife were to cease upon Wife's death. The Estate moved for summary judgment on the grounds that the defects in the original QDRO rendered it a "nullity." In the alternative, the Estate requested that the District Court amend the terms of the original QDRO to reflect the terms of the Consent Order, which "manifest[ed] the 'clear intent of the parties.' " In the event the court declined to do so, the Estate requested that the District Court stay or dismiss the action so that "the parties [could] 'fight it out in state court.' "

Finding that it had " 'jurisdiction over an action for interpleader to determine the proper beneficiary of benefits payable from an ERISA employee welfare plan,' " the District Court denied the Estate's motion to dismiss and declined to grant a stay. (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Howell,* 227 F.3d 672, 674 n. 2 (6th Cir.2000)). Considering the merits of the Estate's motion, the District Court concluded that it could neither "simply ignore" the stated language of the original QDRO, which was "the only QDRO that ha[d] been brought to th[e] Court's attention," nor amend it to reflect the Consent Order.[3] Because the Court found that the original QDRO stated "unequivocally" that benefits under the Plan "shall only be distributed to [Wife] 'when, if, and as paid' to [Husband], and that the rights to payment terminate upon [Wife's] death," the court held that

---

3. The District Court determined that it did not have the authority to "ignore the alleged 'defects' in the language of the [original] QDRO approved by the [circuit] court and look instead to the 'clear intent' of the parties as reflected in the Consent Order." According to the Court, the Estate's request that the Court do so, "would appear to run afoul of the method designated under ERISA for an individual to attach an interest in a former spouse's plan benefits."

the Estate was not entitled to benefits under the Plan. Accordingly, the Court granted Husband's motion for summary judgment.

Following the District Court proceeding, the Estate, on August 4, 2003, filed a motion to amend the original QDRO in the Circuit Court for Harford County.[4] Husband opposed the Estate's motion on multiple fronts, arguing: that the Estate did not have standing; that the court lacked jurisdiction; that the parties were improperly substituted; and that the motion was barred by the doctrine of *res judicata.* On February 10, 2004, in a memorandum opinion, the circuit court granted the Estate's motion to amend the QDRO. In so doing, the court agreed to approve "an amended [D]RO with terms consistent with the original Judgment of Divorce and the Agreement of the parties regarding the division of [Husband's] retirement plan."

The court approved the amended DRO on March 15, 2004 (the "Amended DRO"). The Amended DRO named Wife "the alternate payee through Wilbur W. Bolton, III, Personal Representative of the Estate of [Wife]." The provisions in the original QDRO that distributions to Wife were to occur "when, if, and as paid to [Husband]" and that payments were to "continue until [Wife's] death" were removed. Moreover, the Amended DRO ordered the Plan to pay the Estate one-half of the value of Husband's interest in the Plan, not to exceed $50,000, with payment to take place "as soon as administratively feasible on or after the acceptance of th[e] order by the Plan, and completion of any required forms by the Alternate Payee."

On March 26, 2004, Husband filed a motion to alter or amend, claiming that the circuit court made several erroneous findings of fact and conclusions of law. According to Husband, the circuit court erred in finding that the Estate's motion was not barred by the doctrine of *res judicata,* in

---

4. On July 14, 2003, the Estate had filed a similar motion, but did not make a proper substitution of parties.

allowing an improper substitution of parties, and in finding that the court had jurisdiction to amend the QDRO. On May 18, 2004, the court denied Husband's motion. This timely appeal followed.[5]

## STANDARD OF REVIEW

In an action tried without a jury, we review the case on "both the law and ư.ə evidence." Maryland Rule 8–131(c). We will not disturb the judgment of the circuit court on the evidence unless clearly erroneous, giving deference to the court's opportunity to assess the credibility of the witnesses. Rule 8–131(c). *See McCleary v. McCleary,* 150 Md.App. 448, 457–58, 822 A.2d 460 (2002); *Noffsinger v. Noffsinger,* 95 Md.App. 265, 283, 620 A.2d 415 (1993) (citing *Eckstein v. Eckstein,* 38 Md.App. 506, 516, 379 A.2d 757 (1978)).

## DISCUSSION

### I.

Husband asserts that the circuit court erred or abused its discretion in amending the original QDRO to provide Wife, through the Estate, a survivorship interest in the Plan. According to Husband, the circuit court lacked jurisdiction to do so because the original QDRO had been qualified by the Plan. He also contends that the Estate's claim to benefits is barred by the doctrines of *res judicata* and collateral estoppel.

██ In considering Husband's assignments of error, a brief overview of the relevant federal statutes is helpful. Congress enacted the Employee Retirement Income Security Act of 1974 (P.L. 93–406, 88 Stat. 829) ("ERISA") "to provide better protection for beneficiaries of employee pension and welfare

---

5. In his brief, Husband states that he is appealing "the denial of his motion to revise and/or amend the [March 15, 2004] Order of the Circuit Court for Harford County." The docket sheet reflects that the entry of the circuit court's Amended QDRO occurred on March 18, 2004. Because Husband filed his motion to alter or amend within 10 days of entry of judgment, the appeal is, more properly, characterized as an appeal from the circuit court's modification of the original QDRO.

benefit plans abounding in the private workplace." *Rohrbeck v. Rohrbeck*, 318 Md. 28, 30, 566 A.2d 767 (1989) (discussing the history and intent of ERISA). Included in ERISA is a "spendthrift" provision, restricting a plan participant's ability to assign his or her benefits under a pension plan covered by the act. 29 U.S.C. § 1056(d)(1). ERISA expressly preempts state law and made the regulation of pension plans a matter of exclusive federal interest. 29 U.S.C. § 1144(a); *Rohrbeck*, 318 Md. at 31, 566 A.2d 767 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).

Subsequent to the enactment of ERISA, Congress and various courts questioned the validity and efficacy of state law domestic relations orders that awarded a non-participant spouse an interest in a participant spouse's pension benefits under an ERISA covered plan. In response, Congress passed the Retirement Equity Act of 1984 (P.L. 98–397, 98 Stat. 1433) ("REA"), which exempted from the spendthrift and preemption provisions "qualified domestic relations orders" or "QDROs." 29 U.S.C. § 1056(d)(3)(A). With respect to qualified domestic relations orders, the REA provides, in pertinent part:

(B) for purposes of this paragraph-

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term 'domestic relations order' means any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount and percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order-

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

(E)(i) A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee—

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actual-

ly accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

29 U.S.C. § 1056(d)(3)(B)–(E).

Under the REA, an alternate payee is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under the plan with respect to such participant." *Id.* § 1056(d)(3)(K). An alternate payee, under a qualified domestic relations order, is treated as a plan beneficiary. *Id.* § 1056(d)(3)(J).

As noted above, 29 U.S.C. § 1056(d)(3)(D) prohibits the qualification of domestic relations orders that grant "any type or form of benefit, or any option, not otherwise provided under the plan," or orders that result in a plan having to pay increased benefits. Therefore, QDROs can be drafted to provide for differing payment types depending upon the type of plan involved. One type of payment available is a "shared payment," whereby the QDRO "seeks to divide only actual payments made with respect to the participant under the plan." Pamela D. Perdue, Pension, *Pension and Welfare Benefit Administration QDRO Guidelines (QDROS; Division of Pensions Through Qualified Domestic Relations Orders)*, ALI–ABA Course of Study Materials, 62 ALI–ABA 743, 747 (1998) [hereinafter *Pension and Welfare*]. Under a shared payment approach, only the participant's stream of income is divided and the "alternate payee is not actually given a portion of the actual retirement benefit." *Id.* Therefore, the alternate payee's right to receive payment is dependent upon the participant's receipt of payments under the plan and he or she will not receive a distribution unless, and until, the participant is in pay status. *Id.* Accordingly, QDROs providing for shared payments are typically entered in cases

where the participant is already receiving payments under his or her plan.

In contrast to the shared payment QDROs are QDROs providing for "separate interest" payments. *Id.* at 748. Under a separate interest QDRO, the participant's actual retirement benefit is divided, and the alternate payee is permitted to "receive a portion of the retirement benefit to be paid at a time and in a form different from that chosen by the participant." *Id.* A separate interest QDRO is often preferred where the order "seeks to divide a pension as part of the marital property as opposed to providing for support payments." *Id.*

Upon the receipt of a domestic relations order purporting to grant a participant's interest to an alternate payee:

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

29 U.S.C. § 1056(d)(3)(G)(i).

The REA further provides:

(H)(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the 'segregated accounts') which would have been payable to the alternate payee during the period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18–month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator

shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18–month period described in clause (v)—

(I) it is determined that the order is not a qualified domestic relations order, or

(II) the issue as to whether such order is a qualified domestic relations order is not resolved,

then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18–month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18–month period described in this clause is the 18–month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

(I) If a plan fiduciary acts in accordance with part 3 of this subtitle in-

(i) treating a domestic relations order as being (or not being) a qualified domestic relations order, or

(ii) taking action under subparagraph (H),

then the plan's obligation to the participant and each alternate payee shall be discharged to the extent of any payment made pursuant to such Act.

29 U.S.C. § 1056(d)(3)(H)–(I).

We now consider Husband's assignments of error in the instant case. In its memorandum opinion, the circuit court reasoned that it had jurisdiction to amend the original QDRO because the Consent Order and original QDRO were incorporated, but not merged, into the judgment of divorce. Additionally, the circuit court noted that, in the order of divorce, "for the purpose of maintaining its qualifications as a qualified

domestic relations order under the Retirement Equity Act of 1984, or any other or subsequent legislation," it had retained jurisdiction "over the matter of the pension for purposes of securing a Qualified Domestic Relations Order to protect said Virginia Denton Eller's monetary award."

Husband claims that the circuit court only retained jurisdiction to amend the original QDRO if the order was submitted to the Plan and the administrator "held [it] not to be qualified." Relying upon *Leadroot v. Leadroot,* 147 Md.App. 672, 810 A.2d 526 (2002), Husband asserts, once the Plan administrator qualified the original QDRO and thirty days elapsed from the entry of that order, the circuit court's jurisdiction to revise the order terminated, in the absence of fraud, mistake, irregularity, or clerical mistake. *See* Maryland Rule 2–535.

In *Leadroot,* the circuit court granted a judgment of absolute divorce in 1993, which incorporated a DRO granting the wife a marital property award of one-half of the marital portion of the husband's pension benefits. The marital portion of the husband's plan was calculated as "a fraction of the [husband's] full monthly benefit, the numerator of which shall be the number of months of [husband's] participation in the Plan from the date of the parties' marriage ... and the denominator of which shall be the total number of months of [husband's] participation in the Plan." *Id.* at 674–75, 810 A.2d 526. The wife filed the order with the husband's plan in 1995, and the plan qualified it.

Four years later, without the wife's knowledge, the husband transferred his interest to a separate plan that had previously been acquired, in part, during the marriage. As a result, the husband's pension benefits were significantly increased. He retired and began collecting benefits soon thereafter.

When the wife learned of the transfer, she filed the QDRO with the administrator of husband's second plan. She was informed that the QDRO would not be accepted unless it was separated from the parties' judgment of absolute divorce. Pursuant to the wife's motion, the circuit court issued a separate order in 2001, effectively incorporating the terms of

the parties' first QDRO. The husband did not challenge the language of the 2001 QDRO or claim that it should be altered to reflect his repurchase of the four years of benefits that had been cashed in during the marriage.

Six months later, the husband filed a motion to alter or amend the 2001 QDRO on the grounds that " 'the original divorce decree and QDRO had an error as to the marital portion of the retirement benefits which are owing and due' [wife]." *Id.* at 677, 810 A.2d 526. Because he had cashed in four years of retirement during his marriage and had repurchased those benefits with non-marital funds subsequent to the divorce, the husband claimed the repurchased benefits could not be considered marital property. The circuit court agreed and again amended the QDRO on the grounds of mutual mistake so that the four years of redeemed benefits were not considered part of the marital fraction of husband's total benefits. Claiming that the court was without authority to amend a QDRO eight years after its issuance, the wife filed a motion to alter or amend the judgment, which was denied. *Id.* at 678–79, 810 A.2d 526.

On appeal, this Court initially determined that the circuit court's modifications to the QDRO were clearly revisions as opposed to clarifications. The *Leadroot* Court stated:

> Regardless of what [the husband] chooses to call it, the circuit court did in fact revise the fraction used to compute the marital portion of [the husband's] pension benefits. It did so to correct what it believed to be a "mutual mistake by the parties." A clarification does not modify; it illuminates. And the circuit court, here, was engaged in more than simply illuminating the fraction at issue; it significantly altered that fraction so that it conformed with what the circuit court believed to be the parties' expectations.
>
> * * *
>
> No distinction was made between redeemed and unredeemed months in computing the marital portion of [the husband's] pension benefits in 1993, when the QDRO was first issued, or in 2001, when it was re-issued as a separate

order, after [the husband] repurchased his four years of service. Nor can we do so now without revising the parties' QDRO. To now qualify a term, which was left unqualified both in 1993 and in 2001, plainly constitutes a "revision." *Id.* at 680, 810 A.2d 526.

Considering whether the circuit court retained jurisdiction to revise the QDRO, the *Leadroot* Court noted that, under Maryland Rule 2–535, after thirty days elapse from the entry of a judgment, the circuit court lacks authority to revise the judgment absent fraud, mistake, or irregularity. *Id.* at 682, 810 A.2d 526. Finding no fraud, procedural irregularity, or mistake (jurisdictional error), the *Leadroot* Court held that the circuit court lacked jurisdiction to revise the QDRO eight years after it had originally been entered. *Id.* at 682–84, 810 A.2d 526.

We find *Leadroot* distinguishable from the instant case. Here, the court expressly retained jurisdiction "over the matter of the pension for purposes of securing a Qualified Domestic Relations Order to protect [Wife's] monetary award[.]" Although the Plan administrator accepted the original QDRO as it was drafted by the parties and entered by the court, the Plan administrator later noted several problems with the original QDRO, including the fact that, as drafted, the method and manner in which benefits were to be distributed were unclear. When they were informed of the errors, the parties agreed to submit an amended order to the circuit court, but, before they could do so, Wife died.

In the interpleader proceeding, the District Court, without expressly deciding whether it had been properly qualified,[6]

---

6. State and federal courts have concurrent jurisdiction to review a plan's qualification of a state domestic relations order under ERISA and payments made pursuant to such an order. *See* 29 U.S.C. § 1132(e) (conferring concurrent jurisdiction upon federal district and appellate courts, along with state courts of competent jurisdiction, to decide a participant's or beneficiary's right "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan").

held that the original QDRO, as drafted, "unequivocally" intended benefits to be paid to Wife on a "when, if, and as paid to [Husband]" basis and that Wife's benefits terminated upon her death. The District Court's interpretation of the original QDRO is subject to the doctrine of *res judicata*.

■ As explained in *Warner v. German*, 100 Md.App. 512, 642 A.2d 239 (1994):

> "[A] judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety would have been litigated in the first suit."

*Id.* at 517–18, 642 A.2d 239 (quoting *Rowland v. Harrison*, 320 Md. 223, 229, 577 A.2d 51 (1990)). *See also Anne Arundel County Bd. of Educ. v. Norville*, 390 Md. 93, 887 A.2d 1029 (2005) (holding that a claim of age discrimination filed in state court was barred by the principles of *res judicata*, where the claim had previously been adjudicated on the merits in federal court). Moreover, the parties are collaterally estopped from arguing that the original QDRO provides for a type or manner of payment other than that interpreted by the District Court. *See Colandrea v. Wilde Lake Commn. Ass'n, Inc.*, 361 Md. 371, 391–92, 761 A.2d 899 (2000) (explaining that collateral estoppel is concerned with the factual implications of earlier judgments and applies when there has been a final judgment deciding an issue between the same parties, each of whom had a fair opportunity to be heard on the issue).

A decision by the District Court that the original QDRO had been properly qualified would also be subject to *res judicata*. If such a determination had been made, and had the circuit court merely retained jurisdiction until the Plan administrator qualified the original QDRO, the circuit court's jurisdiction to amend the original QDRO would be subject to the limitations of Maryland Rule 2–535. In that instance, under *Leadroot*, the circuit court could not revise the original QDRO absent fraud, mistake, irregularity, or clerical error.

██ In incorporating the Consent Order with the order of divorce, however, the circuit court expressly reserved jurisdiction "to protect [Wife's] monetary award[,]" as agreed to, and expressed in, the Consent Order. It is well settled that the parties to a divorce proceeding may, and are encouraged to, enter into settlement agreements to "avoid the vagaries attendant" to a court's grant of a monetary award pursuant to F.L. § 8–205. *Fultz v. Shaffer,* 111 Md.App. 278, 297, 681 A.2d 568 (1996) (citing *Schneider v. Schneider,* 335 Md. 500, 516, 644 A.2d 510 (1994)). Under F.L. § 8–105, the court may enforce such settlement agreements as independent contracts, subject to the objective law of contract interpretation. *Dennis v. Fire & Police Employee's Retirement System,* 390 Md. 639, 890 A.2d 737 (2006).

 In construing a contract, we look first to the particular language of the contract, and "we give effect to its plain meaning and do not delve into what the parties may have subjectively intended." *Rourke v. Amchem Prods., Inc.,* 384 Md. 329, 354, 863 A.2d 926 (2004) (citing *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250–51, 768 A.2d 620 (2001)). "[T]he parties to a written contract will not be allowed to place their own interpretation on what it means or was intended to mean; the test is what a reasonable person in the position of the parties would have thought that it meant." *Fultz,* 111 Md.App. at 299, 681 A.2d 568.

The Consent Order reflects the settlement agreement between the parties and their intent that a QDRO express that agreement. The Consent Order states that "[Wife's] attorney shall draft the Qualified Domestic Relations Orders necessary to distribute the pension plan benefits as *herein indicated.*" (Emphasis added.) The Consent Order further provides that Wife's interest in Husband's plan "shall [be] distribute[d] directly to [Wife], by way of a roll-over to her designated plan." The language, "by way of a roll-over," is consistent with a separate interest or separate payment approach where, as here, the participant's interest in the plan is valued as of a specified date and divided. *See* Perdue, *Pension and Welfare,* 62 ALI–ABA at 748 (discussing separate interest QDROs).

In contrast to the Consent Order, the original DRO provided that Wife's interest was to be transferred "by way of a rollover to her designated plan," that Wife was to receive her interest "when, if, and as paid to [Husband]," and that payments to Wife would continue until her death. The provision in the original QDRO providing for benefits to be paid to Wife "when, if, and as paid to [Husband]," is consistent with a shared interest or shared payment approach, whereby "payments start when the [p]articipant chooses, are paid in the form that he chooses, and will terminate completely on his death unless a [qualified joint survivor annuity] has been selected." Carrad, *The Complete QDRO Handbook* at 70. In fact, the shared interest or shared payment approach "is sometimes known as the 'if, as, and when received' approach." *Id.* Nothing in the Consent Order expressly or impliedly suggests that Wife's interest would terminate at her death or that Wife's interest was to be distributed "when, if, and as paid to [Husband]." To the extent that the original QDRO conflicts with the Consent Order, we are persuaded that the language of the Consent Order controls.

Although this Court and the circuit court must afford *res judicata* effect to the District Court's interpretation of the original QDRO, the circuit court retained jurisdiction in its judgment of divorce to amend the QDRO, such that it reflected "the parties' intent, said modification to be entered *nunc pro tunc*, if appropriate." The circuit court's amendments to the original QDRO were, in effect, a clarification of the original QDRO to reflect the intent of the parties as evidenced in the Consent Order, *i.e.*, to provide Wife a "separate interest" distribution in fifty-percent of Husband's pension plan earned during the parties' marriage, not to exceed $25,000, with payment to take place "directly by way of a rollover to her designated plan." That intent was obscured by the language providing that payments would occur "when, if, and as paid to [Husband]" and that "[p]ayments will continue until [Wife's] death."

■ A separate interest award is permitted by F.L. § 8–205 whether the participant spouse's interest in the plan is

vested or unvested at time of the divorce.[7] *See e.g., Prince George's County Police Pension Plan v. Burke,* 321 Md. 699, 584 A.2d 702 (1991) (interpreting F.L. § 8–205 and transferring a participant's interest in a government pension plan to his former spouse). Wife's portion of the Plan, rolled-over to a plan of her choice, would, in the absence of a named alternate payee, ordinarily be the property of the Estate upon her death. *See* Maryland Code (1974, 2001 Repl.Vol.), § 1–101(r) & 7–102 of the Estates and Trusts Article. A copy of the Plan is not included in the record, but neither Husband in this case, nor the Plan administrator in the interpleader proceeding, argued that a "roll-over" to a plan or account of Wife's choosing could not have been accomplished. Therefore, we presume that a separate interest QDRO would have been accepted by the Plan.

We are persuaded that the circuit court did not err or abuse its discretion in amending the original QDRO to reflect the parties' intent, as expressed in the Consent Order, and which they intended to provide for in the QDRO. Enforcement of the original QDRO would frustrate the parties' intent and provide Husband with a windfall payment of that portion of his pension plan that he had agreed to transfer to Wife upon dissolution of their marriage seven months before her death. That transfer was not conditioned on Wife surviving Husband or dependent upon "when, if, and [how]" Husband elected to receive his interest. In the event of her death, there was no contracted for reversion of Wife's marital property award to Husband.

---

7. Family Law § 8–205 provides, in relevant part:
 (a) *Grant of award.*—(1)Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in property described in paragraph (2) of this subsection, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.
 (2) The court may transfer ownership of an interest in:
 (i) a pension, retirement, profit sharing, or deferred pension plan, from one party to either or both parties. . . .

## II.

Without further citation, Husband asserts that the Amended DRO, which assigns benefits to "the alternate payee, [Wife], through Wilbur W. Bolton, III, Personal Representative of [her] Estate" ("Bolton"), is invalid because Bolton is not an "alternate payee" within the definition of 29 U.S.C. 1056(d)(3)(K). Whether a domestic relations order that provides for payment of the alternate payee's interest in a defined contribution plan "through" the personal representative of the estate of the alternate payee can be a qualifiable domestic relations order is a matter of first impression in Maryland. In the end, it may simply be a matter of semantics. Although the Amended DRO, as currently drafted, may not be qualifiable under ERISA and the REA, we are persuaded that the circuit court may further amend the order to secure Wife's marital property award, while at the same time adhering to the strictures of 29 U.S.C. § 1056. We explain.

We have not been directed to case law specifically discussing the issue presented. Courts considering similar issues have found guidance in the purpose and statutory language of ERISA and the REA. Discussion of some key cases is, therefore, appropriate.

In *Ablamis v. Roper*, 937 F.2d 1450 (9th Cir.1991), the United States Court of Appeals for the Ninth Circuit considered whether a deceased spouse could devise her one-half interest in her husband's pension benefits, arising under California community property law, to a third party named in her will. The deceased spouse was married to the plan participant at the time of her death. By will, she devised "all property subject to [her] testamentary power including [her] one-half (½) community property interest in all community assets and any separate property assets [she] may have[,]" to a trust for the benefit of her children from a previous marriage. *Id.* at 1452 (alterations in original). The deceased wife's estate brought an action in the United States District Court for the Northern District of California, claiming a property interest in the participant spouse's retirement benefits. That court held that

California community property law was preempted by ERISA and that a non-participant spouse could not "bequeath her interest in a participant spouses's retirement plan." *Id.*

On appeal, the executrix of the wife's estate argued that the California Probate Court's order enforcing the wife's will was a QDRO that avoided ERISA's preemption. Concluding that ERISA preempted California's community property law, the *Ablamis* Court rejected the executrix's contention that the order of the Probate Court was a valid QDRO. The court explained that the provisions of the REA applied to " 'domestic relations' orders" and not " 'probate' orders," and that "Congress did not intend to classify court orders effecting testamentary transfers as QDROs." *Id.* at 1455. The court also opined that the probate order could not constitute a QDRO because the deceased spouse's estate could not qualify as an "alternate payee" as defined by 29 U.S.C. § 1056(d)(3)(K). According to the *Ablamis* Court:

> An estate, even of a deceased spouse, certainly does not fall within even the most liberal construction of the phrase "spouse, former spouse, child or other dependent of the participant."
>
> Similarly, Ms. Ablamis's death divests her of the title of "spouse or other dependent." The executrix argues that the term "former spouse" encompasses a deceased nonparticipant spouse. In legal parlance, however, the term "former spouse" does not include a deceased spouse. At law, we use the term "former spouse" to refer to a divorced spouse; once a spouse has died we refer to her, for legal purposes, as a "deceased spouse." Nothing in the language of the legislative history of the REA suggests an intention to afford the term "former spouse" a meaning different from its customary usage.

*Id.* at 1456 (quoting 29 U.S.C. § 1056(d)(3)(K)).

Furthermore, the Court determined that permitting such testamentary transfers to third parties would violate the statutory purpose of ERISA "to safeguard the security of the employee's immediate family members in the case of divorce or separation." *Id.* at 1456–57. The Court concluded:

As a matter of policy, ERISA's *limited* exception to the prohibition against assignment and alienation has considerable merit. Pensions are designed for the benefit of the living. Congress wanted to ensure that workers would have the security of a fair pension for their lifetimes. Congress also wanted surviving spouses to have what it considered to be a reasonable degree of security. In this connection, Congress wisely deemed it necessary to protect the divorced spouse for the remainder of her lifetime. From a practical standpoint, in order to do so, it was necessary to give her, upon divorce, the share of pension benefits she would have been entitled to if she had remained married and her husband predeceased her. Since that interest is ordinarily converted into cash or other property at the time of the divorce, it followed necessarily that the divorced spouse would receive full right, title and interest in the settlement proceeds, and that she would therefore be free to bequeath any funds remaining at the time of death to the beneficiary of her choice. However, Congress' fundamental purpose was evident throughout—to ensure that both spouses would receive sufficient funds to afford them security during their lifetimes, not to arrange an opportunity for a predeceasing non-employee spouse to leave a part of her surviving husband's pension rights to others. We must keep in mind that pension benefits are designed to protect individuals in their later years-both the employee and the spouse. That the employee's ultimate pension will be reduced following divorce is unavoidable-because divorce necessitates the maintenance of two households rather than one. However, from the standpoint of pension protection-the fundamental purpose and goal of ERISA-there is no reason to allow a predeceasing non-employee spouse to leave part of her surviving employee spouse's pension to a friend, lover, or relative.

*Id.* at 1457 (footnote omitted).

Subsequent to *Ablamis,* the United States Supreme Court granted *certiorari* in *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct.

1754, 138 L.Ed.2d 45 (1997), to resolve a conflict in the federal circuit courts concerning ERISA's preemption of state community property laws. In *Boggs,* the facts were substantially the same as *Ablamis,* except that the participant husband and the non-participant former spouse were both deceased, and the participant had remarried prior to his death. The children of the deceased non-participant former spouse filed an action in a Louisiana court, seeking an interest in the deceased plan participant's individual retirement account, shares of stock, and monthly survivorship annuity payments. The plan participant's widow petitioned the United States District Court for the District of Louisiana to issue a judgment declaring that ERISA preempted Louisiana law. The District Court concluded that the deceased former spouse's interest arose under Louisiana community property law and the alienation and assignment proscriptions of ERISA were not implicated. A divided panel of the United States Court of Appeals for the Fifth Circuit affirmed.

The Supreme Court reversed, holding that Louisiana's community property law conflicted with ERISA, which, by virtue of the Supremacy Clause of Article Six of the Constitution of the United States and the preemption provision of 29 U.S.C. § 1144(a), preempted otherwise applicable state law. The Court explained that the principal purpose of ERISA was "to protect plan participants and beneficiaries." *Id.* at 845, 117 S.Ct. 1754. That purpose would be frustrated by testamentary transfers of pension benefits to third parties having no relation to the participant. In addition to a potential diversion of a retiree's stream of income, the *Boggs* Court envisioned "troubling anomolies," including the potential of pension plans being "run for the benefit of only a subset of those who have a stake in the plan." *Id.* at 850, 117 S.Ct. 1754.

The Court was persuaded that the REA's QDRO provisions, "which acknowledge and protect specific pension plan community property interests, give rise to the strong implication that other community property claims are not consistent with the statutory scheme." *Id.* at 834, 117 S.Ct. 1754. The respondents in *Boggs* did not contend that there was a valid QDRO,

but they asserted that it was "anomalous and unfair that a divorced spouse, as a result of a QDRO, will have more control over a portion of his or her spouse's pension benefits than a predeceasing spouse." *Id.* at 854, 117 S.Ct. 1754. Rejecting that argument, the Court stated:

Congress thought otherwise. The QDRO provisions, as well as the surviving spouse annuity provisions, reinforce the conclusion that ERISA is concerned with providing for the living. The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have available during their retirement as a means of income. In the case of a predeceased spouse, this concern is not implicated. The fairness of the distinction might be debated, but Congress has decided to favor the living over the dead and we must respect its policy.

*Id.*

At least two courts, the United States Court of Appeals for the Ninth Circuit and the Court of Appeal of California, have relied upon *Ablamis* and *Boggs* in holding that a domestic relations order providing for payment to a deceased non-participant former spouse was not qualifiable under the REA. In *Branco v. UFCW–Northern California Employers Joint Pension Plan*, 279 F.3d 1154 (9th Cir.2002), the Ninth Circuit Court of Appeals considered whether a domestic relations order, awarding a non-participant former spouse community property pension benefits, could be enforced as a QDRO, where the non-participant former spouse died before the participant became eligible for benefits. During a divorce proceeding, the participant spouse stipulated to a court order awarding his former wife a community property interest in 47% of his pension benefits. Benefits were to be paid to the former wife "so long as they were payable to or on behalf of [the participant]." *Id.* at 1156.

The court order was apparently filed with the participant's plan before the former wife died. When the participant became eligible for benefits, the plan deducted the former wife's community property share from the participant's bene-

fits, presumably retaining her portion. The participant filed a complaint in state court, alleging breach of contract and claiming that his former wife's benefits should have reverted to him upon her death. The plan removed the case to the United States District Court for the Northern District of California and claimed that the participant's claims were preempted by ERISA.

The District Court concluded that ERISA was not implicated because the participant was not deprived of benefits to which he was entitled. Therefore, between the plan and the former wife's estate, her estate was entitled to her benefits under the plan. According to the District Court, such a distribution of benefits would protect the former wife's community property award and require the plan to satisfy its obligation of paying the full earned benefit amount.

The Ninth Circuit initially determined that, unless the state court order awarding the deceased former wife an interest in the plan was a QDRO, her benefits were subject to the anti-alienation provisions of ERISA and could not be devised. Relying upon *Ablamis,* the *Branco* Court determined that, when the former wife died, "she was divested of her qualified status under ERISA" because she was no longer a "spouse" or "former spouse." *Id.* at 1158. Therefore, "[p]ayments to [the former wife] as a deceased spouse are not authorized under ERISA's definition of a qualifying recipient, because at that point, the QDRO does not relate to marital property rights of a spouse or former spouse." *Id.* The *Branco* Court also concluded that payments to the former wife's estate or to her heirs were similarly precluded under ERISA because they did not come within the definition of an "alternate payee" and were not mentioned in the state domestic relations order. Finally, citing *Ablamis* and *Boggs,* the Court reasoned that permitting a deceased former spouse to devise an interest in a living participant's pension benefits would violate the statutory purpose of providing a stream of income to the participant and his or her beneficiaries in their retirement years.

The Court of Appeal of California, Fourth District relied upon similar reasoning in *In re the Marriage of Shelstead,* 66 Cal.App.4th 893, 78 Cal.Rptr.2d 365 (1998). In that case, the California appellate court held that an order granting an alternate payee and "her designated successor in interest" the right to monthly payments under a pension plan until the participant's death could not be qualified under the REA and ERISA, because it would require the plan to "pay benefits to an individual ( [the alternate payee's] successor) who is not an 'alternate payee' within the meaning of ERISA." *Id.* at 367, 372. In that case, the non-participating spouse's interest in the participant's retirement plan was awarded in a divorce action pursuant to California's community property laws. After the parties' divorce, the trial court entered a proposed QDRO, naming the non-participating former spouse an alternate payee.

Upon the participant's eligibility under the plan, each month the plan was directed to make payments to the alternate payee, "or her designated successor in interest should [she] predecease [the participant], until terminated by [the participant's] death." *Id.* at 367. In a later proceeding, the trial court determined the order to be a QDRO. The plan appealed to the California Court of Appeal claiming, among other things, that the order could not be qualified because the wife's successor was not an "alternate payee" within the contemplation of 29 U.S.C. § 1056(d)(3)(K).

Considering whether the order in *Shelstead* violated the statutory scheme, the California Court of Appeal explained that, under a strict literal reading of 29 U.S.C. § 1056(d)(3)(B)(i)(I), a domestic relations order designating a successor in interest could be a valid QDRO because the statute does not expressly preclude such a designation. It only provides that an order is qualified if it creates or assigns rights to receive pension benefits to an "alternate payee." So long as the statutory requirements are satisfied, there is a qualified order and "the fact that the order further permits the alternate payee to exercise her rights under state community property law does not change this conclusion." *Id.* at 371.

The *Shelstead* Court reasoned, however, that such an assignment still violates the "central purpose of the ERISA and REA ... which seek to provide for the economic security of the participant or the participant's dependents-those defined as alternate payees." *Id.* The *Shelstead* Court further explained that " 'Congress' primary purpose in enacting the limited exception to ERISA's prohibition on assignment and alienation was to safeguard the security of the employee's *immediate family members* in the case of divorce or separation.' " *Id.* (quoting *Ablamis,* 937 F.2d at 1456–57) (emphasis in *Shelstead*). Thus, it concluded, if testamentary transfers were permitted by the order at issue, "a third party 'successor' would have the right to obtain benefits at the expense of the living employee; this outcome[,] is 'incompatible with [ERISA's] spendthrift provision.' " 78 Cal.Rptr.2d at 371 (quoting *Boggs,* 520 U.S. at 852, 117 S.Ct. 1754).

Additionally, the *Shelstead* Court reiterated the Supreme Court's concern in *Boggs* that the fiduciary obligations of the plan, which, under 29 U.S.C. § 1056(e), apply only to the "participants" and "beneficiaries," would be implicated because an undesignated successor in interest is not a beneficiary under ERISA. 78 Cal.Rptr.2d at 371–72. *See also,* 29 U.S.C. § 1056(d)(3)(J) (noting that an alternate payee, including a former spouse, is considered a beneficiary under ERISA). The court concluded that, "[r]ead together, ERISA's statutory definitions and fiduciary provisions prohibit a court from issuing a domestic relations order requiring an ERISA plan administrator to pay benefits to a person who does not fall within the definition of an alternate payee." *Id.* at 372. Nevertheless, the *Shelstead* Court was careful to limit its holding to the facts of that case. *Id.* at 372. The court remarked that its decision might have been different had the QDRO specifically identified as a successor in interest an individual, such as a child, who was included within the definition of "alternate payee." The court noted that the plan at issue did not provide for payments through a "separate interest approach," whereby "a court may have additional

options permitting it to provide the divorced nonemployee spouse with a form of testamentary rights." *Id.*

More recently, in *Divich v. Divich*, 665 N.W.2d 109 (S.D. 2003), the Supreme Court of South Dakota considered, among other things, the validity of a QDRO permitting the non-participant spouse to devise to her estate her portion of pension plan benefits were she to predecease the plan participant. The parties' divorce decree incorporated the terms of a settlement agreement, which granted the non-participant former spouse a vested one-half interest in her former husband's retirement account. *Id.* at 111. Payment of benefits to the wife would occur on a monthly basis. *Id.* She attempted to preserve her interest through a proposed QDRO that provided, "if [she] predeceased [the husband (participant),] her share of the retirement benefits would be payable to her estate." *Id.* Instead, the trial court adopted a QDRO providing that, in the event the wife predeceased the husband, the wife's portion of the benefits would revert back to the husband. The wife appealed.

Initially, the *Divich* Court stated that, under South Dakota's marital property laws, a retirement plan was a divisible marital asset because it represented consideration to the spouse in lieu of a higher salary. *Id.* at 112. Next, the court considered *Ablamis* and the Ninth Circuit's discussion of ERISA's survivor annuity provisions, and concluded that, not only did the parties stipulate that the plan at issue is exempt from federal legislation, but ERISA's spendthrift provisions were not applicable to QDROs. The court went on to hold that, because the grant of a share of retirement benefits is a property right, it could be paid under the terms of a QDRO to a non-participant spouse's estate should she predecease the plan participant. The court found persuasive the wife's argument that, had the plan participant bought her out of her share of the retirement plan, she would be free to devise that money to her estate. The court concluded that the result should not change merely because the wife was paid on a month-to-month basis instead of through a lump sum award. *Id.*

Without expressly considering the issue, other courts have upheld QDRO's that grant the alternate payee's estate an interest in the alternate payee's benefits upon the alternate payee's death. *See, e.g., Seal v. Raw,* 954 S.W.2d 681 (Mo.Ct. App.1997).

The cases cited above are not controlling, and we do not find *Boggs* and *Ablamis* particularly instructive on the issue presented. Neither *Boggs* nor *Ablamis* concerned the entry of a QDRO. In fact, in *Ablamis,* the Ninth Circuit reasoned that, where a QDRO is entered,

> [s]ince [the divorced former spouse's] interest is ordinarily converted to cash or other property at the time of divorce, it follow[s] necessarily that the [former] spouse would receive full right, title and interest in the settlement proceeds, and that she would therefore be free to bequeath any funds remaining at the time of death to the beneficiary of her choice.

937 F.2d at 1457. *See also Shelstead,* 78 Cal.Rptr.2d at 372 ("[U]nder the separate interest approach, a court may have additional options permitting it to provide the divorced nonemployee spouse with a form of testamentary rights consistent with ... ERISA."). Therefore, we are not persuaded by the *Branco* and *Shelstead* opinions. That being said, we find guidance in the reasoning of the *Divich* Court. Similar to South Dakota law, in Maryland a retirement or pension plan is a marital asset, which can be divided pursuant to a marital property award. F.L. § 8–205.

As explained in Part I, through the Consent Order, Husband agreed to transfer to Wife one-half of the marital portion of the Plan, not to exceed $25,000. The distribution was to take place by way of a "roll-over to her designated plan." Had a QDRO been drafted that clearly reflected the parties' intent for a "separate interest" lump sum distribution, Wife's marital property award could have been protected and Husband would not be able to assert an interest in the marital property that he assigned to her. Husband does not contend otherwise. Instead, he argues that the original QDRO effec-

tively superseded the Consent Order. Presumably, had the lump sum distribution occurred prior to Wife's death, unless otherwise provided for by the terms of her designated plan, Wife's portion of the award would become part of the Estate. In either event, we are not persuaded that a failure to submit a proper QDRO prior to Wife's death should alter that result.

The QDRO, as amended by the circuit court, however, provides for payment through the personal representative of Wife's estate, a party not included within the REA's definition of an "alternate payee." Courts have interpreted the provisions of the REA and the 29 U.S.C. § 1056(d)(3)(K) definition of "alternate payee" strictly. *See Branco,* 279 F.3d at 1158 (concluding that a domestic relations order providing for payment to a deceased former spouse was not qualifiable because a "deceased spouse" was not included within the term "former spouse"). *But see Shelstead,* 78 Cal.Rptr.2d at 365 (opining that, under a strict literal reading of 29 U.S.C. § 1056(d)(3)(B)(i)(I), a domestic relations order providing for payment to a successor in interest could be a valid QDRO because the statute did not expressly prohibit such orders). To the extent that it can be argued that payment of an alternate payee's interest in a plan "through" the alternate payee's personal representative designates the personal representative as the "alternate payee" and renders the Amended QDRO unqualifiable, we believe that the QDRO can be amended again, *nunc pro tunc,* to simply name Wife as the "alternate payee," and avoid the issue. We explain.

In the judgment of divorce, the circuit court reserved jurisdiction to secure a QDRO protecting Wife's monetary award. In the original QDRO, the court retained jurisdiction to modify the QDRO "so as to make it a Qualified Domestic Relations Order that reflects the parties' intent, said modification to be entered *nunc pro tunc,* if appropriate." This Court has previously explained that an order entered *nunc pro tunc* is " 'an entry now of something actually previously done to have effect of former date; office being not to supply omitted action, but to supply omission in record of action really had but omitted through inadvertence or mistake.' " *Short v.*

*Short,* 136 Md.App. 570, 578, 766 A.2d 651 (2001) (quoting *In re Peter's Estate,* 175 Okla. 90, 51 P.2d 272, 274 (1935)).

In a slightly different context, courts have entered domestic relations orders, granting a former spouse an interest in a deceased participant's plan benefits, *nunc pro tunc,* to secure the former spouse's monetary award. For example, in *Patton v. Denver Post Corp.,* 326 F.3d 1148 (10th Cir.2003), the United States Court of Appeals for the Tenth Circuit held that a domestic relations order, which granted a former spouse an interest in her deceased spouse's plan benefits and was entered *nunc pro tunc,* was a qualified domestic relations order. In *Patton,* the parties made financial disclosures during their divorce proceedings. When the husband inquired into his pension benefits with his employer, the employer disclosed the husband's participation in one pension plan, but inadvertently failed to disclose the existence of a second plan. A domestic relations order granting the wife one-half of the husband's interest in the disclosed plan, valued as of the date of the parties' divorce, was entered by a Colorado state court. The husband later died before he had reached the age of retirement or became eli "ble for benefits. As a result, under 29 U.S.C. § 1055(a)(2), benefits were only payable under the plan to a surviving spouse. Because the husband had not remarried at the time of this death, his former spouse qualified as a surviving spouse pursuant to 29 U.S.C. § 1056(a)(3)(F)(i). The wife filed the court order granting her one-half of the disclosed plan with the plan administrator. The order was qualified and the plan provided the former spouse a lump sum survivorship payment.

The former spouse believed that the payment was very low in light of the years of service her former spouse had provided to the employer. A subsequent investigation revealed the existence of the second plan, which had not been disclosed at the time of the divorce proceedings. When the former spouse presented the QDRO to the second plan administrator, the plan refused payment, claiming that the order was not qualifiable because it increased the plan's liability and provided a type of payment not otherwise available under the plan, *i.e.,*

survivorship payments to a former spouse not designated prior to the plan participant's death. The former spouse returned to state court and requested a second order dividing the second plan in the same manner as the first plan. The state court entered an order *nunc pro tunc*, effective on the date of the parties' divorce. The *nunc pro tunc* order granted the former spouse a one-half interest in the participant's interest. When the *nunc pro tunc* order was filed with the second plan, the plan administrator rejected the order. The wife then filed an action to determine her right to payment in the United States District Court for the District of Colorado, which found in the wife's favor.

On appeal, the United States Court of Appeals for the Tenth Circuit concluded that, although the domestic relations order was entered and filed with the plan posthumously, the order did not provide for an increase in benefits paid because it was entered *nunc pro tunc* and therefore "must be considered to have been entered before the death of the participant." *Id.* at 1152. According to the *Patton* Court, the *nunc pro tunc* order was "akin to the correction of a clerical error, which is an accepted use for *nunc pro tunc* orders." *Id.* at 1153. The Court explained:

> All that occurred in this case is that the state court and the parties previously lacked full information as to the assets to be distributed in the divorce settlement. When those assets were finally discovered, the court simply allotted them as it had intended under the original plan, i.e., as it would have done had it been aware of their existence at the time. The historical facts were not changed-two pension plans existed on the date of the divorce as well as the date of death. That is, once discovered, the second plan simply was added to the list of assets and apportioned so as to achieve the same equitable division of marital assets originally intended by the domestic relations court. No other person's vested interest was upset by this action.

*Id.*

The *Patton* Court went on to reject the United States Court of Appeals for the Third Circuit's reasoning in *Samaroo v.*

*Samaroo,* `193 F.3d 185 (3d. Cir.1999), in which that court held that a beneficiary's interest had to be secured prior to the date of the participant's death and that an order entered *nunc pro tunc* was not qualifiable because it provided for increased benefits. According to the Tenth Circuit, the Third Circuit's opinion in *Samaroo* "was not compelled by statute or case law," and " 'work[ed] an unwarranted interference with the states' ability to administer their domestic relations law and to effectuate equitable divisions of marital assets.' " *Patton,* 326 F.3d at 1153 (quoting *Samaroo,* 193 F.3d at 192 (Mansmann, J., dissenting)). In conclusion, the Tenth Circuit explained the importance of *nunc pro tunc* orders in the context of QDROs, remarking: "*Nunc pro tunc* QDROs are desperately needed in the domestic relations arena. There must be a way to secure a former spouse's property rights to a pension that could suddenly disappear as a result of a technicality or a family law attorney's inexperience in drafting QDRO's." *Id.* at 1154 (quoting Gary Shulman, *QDROs—The Ticking Time Bomb,* 23 Family Advocate, 26, 29 (2001)).

The United States Court of Appeals for the Eighth Circuit in *Hogan v. Raytheon, Co.,* 302 F.3d 854 (8th Cir.2002), and the United States Court of Appeals for the Ninth Circuit in *Trustees of the Directors Guild of America–Producer Pension Benefits Plans v. Tise,* 234 F.3d 415 (9th Cir.2000), relied upon similar reasoning as the *Patton* Court regarding the use of posthumously entered *nunc pro tunc* domestic relations orders to reach similar results. *But see Samaroo v. Samaroo,* 193 F.3d 185 (3d. Cir.1999).

Here, due to inadvertent drafting mistakes, the original QDRO failed to secure Wife's interest in Husband's pension as intended by the parties prior to her death. Because a *nunc pro tunc* amendment of the QDRO relates back to the time prior to Wife's death, we are persuaded that it will not fail for naming Wife as the alternate payee, even though she is now deceased.

Accordingly, assuming, without deciding, that the QDRO, as amended, is not qualifiable, it could be further amended by the

circuit court to secure the marital property award contracted for by Wife prior to her death. Therefore, we vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**