956 A.2d 770

**Le'Etta Johnson BARNES**

v.

**Patrick Ivan BARNES.**

**No. 106. Sept. Term 2007.**

Court of Special Appeals of Maryland.

Sept. 9, 2008.

392

Josephine Scarlett of Suitland, for appellant.

Jan M. Hauser (Phyllis A. Hotchkiss on the brief), Riderwood, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER and RAYMOND G. THIEME, JR., (retired, specially assigned), JJ.

HOLLANDER, J.

This case arises from divorce proceedings between Le'Etta Johnson Barnes, appellant, and Patrick Ivan Barnes, appellee, litigated in the Circuit Court for Charles County. Appellant challenges an Order issued by the circuit court on February 15, 2007, which incorporated the terms of a settlement agreement that the parties entered on the record at a hearing on August 1, 2006. Thereafter, appellee's counsel prepared the Order and submitted it to the court, without appellant's signature, because appellant refused to sign it.

Appellant presents three issues for our review, which we quote:

I. Whether the Circuit Court committed clear error by issuing a consent order to dispose of contested marital property issues without requiring the Appellee to file a financial statement and without considering evidence that the terms of the order did not designate the specific retirement benefits to be distributed.

II. Whether the Circuit Court abused its discretion by failing to consider evidence that the parties had not reached an agreement on terms of the proposed settlement agreement represented by the consent order during the settlement hearing, and evidence that the Appellant had not consented to the terms as intended by the Appellee.

III. Whether the Consent Order issued by the Circuit Court should be overturned as null and void because it is unenforceable as a Qualified Domestic Relations Order, the settlement hearing upon which it is based did not result in a meeting of the minds between the parties, and the settlement negotiations were not entered into in good faith by the Appellee.

For the reasons that follow, we shall dismiss the appeal.

## I. FACTUAL AND PROCEDURAL SUMMARY

The parties were married on August 15, 1992, and separated in February of 2005. No children were born to their union. According to the briefs, appellee is employed by Verizon and appellant is a "sole proprietor nail technician."

Appellee filed a Complaint for Absolute Divorce on April 17, 2006, based on a one-year separation. He alleged that the parties had resolved issues pertaining to the division of marital property and spousal support, and that no property or support issues remained for the court to resolve.

In her Answer, appellant denied that the separation was intended to end the marriage. She also denied that the parties had resolved all issues pertaining to spousal support and the division of marital property. Appellant subsequently

filed a Counterclaim for Absolute Divorce on grounds of adultery and constructive desertion, in which she detailed the property issues that she contended were unresolved. In her Counterclaim, which appellant personally signed in accordance with Maryland Rule 9–202(a), appellant averred:

16. During the course of their 13–year marriage, [appellant] has been self-employed and has relied on [appellee] for financial support and maintenance, including pension and health insurance. During their discussions of financial planning, [appellee] discouraged [appellant] from opening a retirement account or IRA stating continuously that the two would be able to live off his pension from Verizon. [Appellant] relied to her detriment on [appellee's] representation that he would take care of her and did not open a retirement account.

17. In March 2006, during a telephone conversation [appellee] informed [appellant] that they could stay married so she would be able to continue her medical insurance coverage.

Accordingly, appellant requested a judgment of absolute divorce as well as other relief, including spousal support of $850 per month, an order that appellee continue appellant's health insurance, and half of the funds from two real estate transactions involving the parties. Of import here, appellant also sought entitlement to "her share of [appellee's] retirement account with Verizon and any and all other retirement accounts, IRA, 401–K, pension plans, stock or profit sharing plans held or obtained during the course of the marriage...." Along with her Counterclaim, appellant filed a long-form financial statement in the form prescribed by Md. Rule 9–203(a).

Appellee filed an Answer to the Counterclaim on July 11, 2006, requesting its dismissal. But, appellee did not file a financial statement. On the same date, appellant filed an Amended Complaint for Absolute Divorce, seeking a division of marital assets. In relevant part, the Amended Complaint requested:

C. That the Court order a division in kind or, if appropriate, a sale of all real and personal property jointly owned by the parties, including the Defendant's business, Nails N Flight, and if sale be decreed, distribute the proceeds equitably.

D. That the Court, pursuant to Md.Code, *Family Law*, Section 8–205(a) transfer to the Plaintiff his marital share of any and all of the assets from the Defendant's business, Nails N Flight.

On August 1, 2006, the parties and their lawyers attended a status conference before a domestic relations master. Prior to the conference, the parties and their attorneys engaged in settlement negotiations in the courthouse, which are not a part of the record. In their briefs, the parties present differing accounts of that meeting.[1]

---

1. It is not our role to resolve any factual disputes. *See, e.g., Hartley v. State*, 238 Md. 165, 168 (1965) (appellate court "cannot invade the province of the *nisi prius* courts by making an original factual finding"). *See also Montgomery Co. v. Md. Soft Drink Ass'n*, 281 Md. 116, 122, 377 A.2d 486 (1977) ("We cannot, of course, make a factual finding."); *Phoenix Services L.P. v. Johns Hopkins Hospital*, 167 Md. App. 327, 406–407, 892 A.2d 1185 ("As an appellate court, it is not our province to make … factual determinations."), *cert. denied*, 393 Md. 244, 900 A.2d 750 (2006). Nevertheless, we shall summarize the parties' respective accounts of what transpired.

Appellant asserts that the parties "discussed the terms of the settlement for approximately five (5) minutes in the hallway of the courthouse, each separately, with their respective attorneys." According to appellant, "[n]either party sat down and discussed the terms of the settlement with each other; neither party reviewed a written document containing proposed settlement terms." Appellant claims that, during the settlement negotiations, her attorney requested financial information from appellee's attorney. She further asserts that she requested financial information from appellee on three occasions *before* the August 1, 2006 hearing, ("On three separate occasions and during the settlement discussions with the Master in this proceeding, the Appellant requested financial information from the Defendant *prior to the settlement hearing.*" (Emphasis added.)). But, the documents cited by appellant make clear that the three occasions were (1) verbally, during the negotiations on the day of the hearing, i.e., August 1, 2006; (2) a letter dated September 29, 2006; and (3) a letter dated December 7, 2006.

Appellee contends that, after "at least fifteen (15) minutes of separate discussions with their respective attorneys, and without further demand

In any event, it is undisputed that, after their negotiations, the parties and counsel came before the domestic relations master. The following colloquy is relevant:

[THE MASTER]: Now, do I understand that the parties have an agreement that you want to put onto the record?

[APPELLEE'S COUNSEL]: That's correct, Your Honor.
[THE MASTER]: Okay. Which one of you wants to state it?

[APPELLEE'S COUNSEL]: I'll go forward.

[THE MASTER]: Okay.

[APPELLEE'S COUNSEL]: [I]t is my understanding that the parties have agreed that they have resolved *all of their marital property issues* as follows:

That Mr. Barnes will give Mrs. Barnes three thousand dollars within thirty days of today.

That Mrs. Barnes will receive *the marital share of Mr. Barnes's pension with Verizon* if, as, and when he receives it pursuant to the Bangs Formula.

And, Mr. Barnes will continue Mrs. Barnes on his health insurance through Verizon through the marriage. And ... will cooperate with Mrs. Barnes if Verizon is inclined to allow her to continue to stay on the health insurance ... *with the understanding that Mrs. Barnes will be responsible for payment of the health insurance following divorce.*

*All other property has been divided to the marital* [sic] *satisfaction of the parties.*

*And, each party will keep all other property which is in their possession with no right of claim to any property ... not otherwise mentioned.*

---

for financial documents or information from each other, the parties agreed to a final and complete settlement for distribution of their marital property, and for health insurance coverage for [appellant]." Appellee adds: "It was immediately decided that the agreement should be placed on the record in open court."

It is also my understanding that Mr. Barnes will file what will be a Second Amended Complaint for Absolute Divorce based on a one year mutual and voluntary separation.

And, we will then move forward filing ... once that it is answered [sic], filing a motion to refer the case to an examiner to take uncontested testimony.

[THE MASTER]: Okay. [Counsel for appellant], did she leave anything out?

[APPELLANT'S COUNSEL]: *No.*

[THE MASTER]: Is that your understanding of the agreement?

[APPELLANT'S COUNSEL]: Yes, Your Honor. *That's my understanding of the agreement.* (Emphasis added.)

The domestic relations master then asked the attorneys to voir dire their clients. The following colloquy is pertinent:

[APPELLANT'S ATTORNEY]: Would you state your name and address for the record, please?

[APPELLANT]: Leetta [sic] Johnson Barnes. My address is 209 King James Road, Upper Marlboro, Maryland.

[APPELLANT'S ATTORNEY]: And Ms. Barnes, how old are you?

[APPELLANT]: Forty-three.

[APPELLANT'S ATTORNEY]: Ms. Barnes, are you able to read and write?

[APPELLANT]: Yes.

[APPELLANT'S ATTORNEY]: Are you under the influence of drugs, alcohol or any other debilitating substances at this time?

[APPELLANT]: No.

[APPELLANT'S ATTORNEY]: Ms. Barnes, you've heard the agreement that has been explained on the record today. Do you understand the agreement?

[APPELLANT]: *Yes.*

[APPELLANT'S ATTORNEY]: *Are you in agreement with it?*

[APPELLANT]: *Yes.*

[APPELLANT'S ATTORNEY]: Have you been satisfied with my services?

[APPELLANT]: Yes. (Emphasis added.)

The master made one observation concerning the agreement:

[Y]ou may be well aware of this, but my understanding is that if there is an order for Mr. Barnes to keep insurance on Ms. Barnes after a divorce ... I guess what I'm saying is do you want to give effect to that provision? I think it does need to be part of the order. But, obviously it will be so, I just wanted to make sure of that.

There was no objection to the master's suggestion. Appellant's counsel then advised the master that "[t]here is one other matter." She explained: "Mrs. Barnes would like to have stated in the order that she has the right to use her maiden name."

The master gave the parties until October 6, 2006, to prepare and sign a proposed order incorporating the terms of the agreement. Appellee's attorney agreed to draft the proposed order. The master then concluded the hearing, stating: "Then I guess that's it. I think ... you have shown the ability to cooperate and you have saved yourself a lot of time and effort and not to mention money. So, I hope everything goes well according to plan."

The merits hearing of October 6, 2006, was rescheduled to November 17, 2006, as a result of a medical emergency on the part of appellee's attorney. It was then rescheduled to January 5, 2007, due to maternity leave for appellant's attorney, and was apparently postponed again because of a conflict on the part of appellee's attorney. To our knowledge, it has not yet been held.

In the meantime, appellant's attorney refused to sign the proposed order drafted by appellee's attorney. Consequently, on January 19, 2007, appellee filed a "Motion to Enter," in which he asked the court to issue the proposed order without

appellant's signature. The motion alleged that counsel for appellee had drafted a proposed order and sent it to counsel for appellant, but appellant's counsel rejected it. Appellee further explained that, because appellant's counsel refused to sign the proposed order, appellee obtained a transcript of the hearing held on August 1, 2006, and revised the proposed order to conform to the transcript, but counsel for appellant still refused to sign it. According to appellee's motion, appellant's counsel contended that the proposed order contained provisions that were not agreed to at the hearing, and appellant did not have " 'full disclosure as to [appellee's] retirement plans (emphasis added) prior to entering into full disclosure.' " Further, the motion stated:

That [appellant's] present position is no more than buyer's remorse.

That [appellee] and [appellant] entered into good faith negotiations and a good faith agreement.

That the Order provided with this Motion accurately reflects the agreement placed on the record pursuant to the official transcript of proceedings of August 1st 2006.

Indeed, the text of the proposed order submitted by appellee with the motion tracked almost verbatim the parties' agreement at the hearing on August 1, 2006. The proposed order provided:

That by agreement of the parties, as stated on the record on Tuesday, August 1st 2006, and as acknowledged on the record on August 1 st 2006 that this Agreement resolves all marital property issues, it is thereupon this —— day of ——, 2007, by the Circuit Court for Charles County, Maryland, hereby,

ORDERED, that the Plaintiff pay to the Defendant Three Thousand Dollars ($3,000.00) within thirty (30) days of August 1st 2006; and it is further,

ORDERED, that the Defendant receive her marital share of the Plaintiff's pension with Verizon, if, as, and when received by the Plaintiff, pursuant to the BANGS formula; and it is further,

ORDERED, that the Plaintiff continue the Defendant on his health insurance through Verizon until the date of absolute divorce and the Plaintiff shall cooperate with the Defendant if Verizon is inclined to allow the Defendant to continue to receive health insurance through Verizon. The Defendant shall be solely responsible for payment of her health insurance following the date of absolute divorce; and it is further,

ORDERED, that all other property has been divided to the satisfaction of the parties and each shall keep all other property which is in their possession and which is not otherwise mentioned herein, with no right of claim by the other.

The transcript of the hearing on August 1, 2006, and a letter dated July 20, 2006, from appellant's counsel to appellee's counsel, were attached as exhibits to the motion. In the letter, appellant's attorney rejected a settlement offer apparently advanced by counsel for appellee in a prior letter, and proposed alternative terms. In the course of the letter, appellant's counsel stated: "We are aware that the court will likely order that Mrs. Barnes receive her marital share of Mr. Barnes [sic] pensions, including stock options and other annuities, from his employment at Verizon."

On January 23, 2007, appellant's attorney filed a "Response to Motion to Enter and Motion Requesting Financial Information," along with a sworn affidavit executed by appellant. Appellant averred:

During the [August 1, 2006] hearing, the attorney for [appellee] read a statement into the record. It is my understanding that the statement was to express our intention to settle the property issues in the ... divorce proceeding.

I did not understand or intend that statement to represent a final disposition of all issues. I believed and understood that I would get an opportunity to review and sign a written settlement agreement between myself and [appellee] before the case concluded.

On or about August 13, 2006, my attorney informed me that [appellant's] attorney, Phyllis Hotchkiss, had drafted a document to be signed by the court stating that I was to pay for my own health insurance and that I would not receive $3000.00 from the real estate in Baltimore until she signed the document. She also told me that the document stated that I would receive my marital name.

I advised my attorney at this time that I did not understand at the hearing that I was to pay for my own health insurance because I thought the judge (master) said that [appellee] was to continue to pay for my health insurance. I also told my attorney that I did not know what I was receiving from [appellee's] pension because we had not seen any paperwork showing [appellee's] pension and 401K plans. At this time, I authorized my attorney to request the pension and health insurance information from Verizon. I also asked her to have the order grant the name change and to have the specific terms of our agreement put into a separate document so I could have some privacy when I went to businesses to change my name.

On or about September 10, 2006, my attorney showed me a document written by Ms. Hotchkiss ... that was supposed to represent the agreement between us regarding the property issues. The document contained waivers of all other pension, 401K, and retirement benefits that [appellee] had accumulated during the course of our marriage, except his pension from Verizon. I did not agree to this waiver during the hearing with Master Woodside on August 1.

The document I read on or about September 10 also stated that after the divorce, [appellee] would cooperate with me and Verizon so that I would continue receiving health insurance from Verizon, and that I would pay all costs for the health insurance. I did not agree to this during the hearing with Master Woodside on August 1 because I heard the statement during that hearing that he was to continue health insurance coverage for me after the divorce.

The September 10 document also stated that I was to receive $3,000.00 thirty days from August 1, but I had not received any money and my lawyer told me that Ms. Hotchkiss would not release the check until we signed the agreement.

I informed my attorney that I could not sign the document and go forward because I did not agree to what the document stated, specifically that I was to pay for my own health insurance and that I waived my rights to [appellee's] 401K and other portions of his retirement.

On or about September 28, 2006, my attorney called me to say that she could not get any information from Verizon about the health insurance and the pension benefits because she needed [appellee's] permission to discuss his benefits. I reviewed a letter she had written to [appellee's] lawyer asking for financial information and informing her that I objected to the way the draft agreement waived my rights and held me responsible for paying for my own health insurance.

On or about December 5, 2006, my attorney told me that [appellee's] attorney had not sent any financial information regarding [appellee's] pension or health insurance and they were going to ask the court to proceed without our agreement.

On or about December 18, 2006, [appellee] called me and asked why I was holding up the agreement. I told him that my attorney could not get financial information regarding his pension plans and health insurance from Verizon or his attorney, and that I did not agree to pay for my own health insurance. He informed me that Verizon would not let me continue on the plan after the divorce anyway so that didn't make any difference.

During the hearing on August 1, I did not understand that [appellee's] attorney said I was to pay for my own health insurance or that I would be waiving rights, since there was discussion that I would be returning to court with a witness to make a final decision about the divorce. I also believed that I would have something written to agree to

before the property issues were final and not that what I heard and what was said in court would count for a written agreement.

In her Response, appellant referred to the allegations of her affidavit, and argued that the settlement was discussed "for less than fifteen (15) minutes in the hallway of the ... courthouse prior to entering the hearing room. After entering the hearing room, [appellant] only heard [appellee's] lawyer speak the terms of the proposed settlement into the record and did not get an opportunity to review any writing...." Moreover, she contended that she had never received "a financial or benefits statement revealing [appellee's] assets, which is required in this case by Md. Rule 9–203(e) and has been requested on three separate occasions by [appellant's] attorney...."

Appellant insisted that "she entered into good faith negotiations but [appellee] has not acted in good faith by failing to honor the proposed agreement he seeks to enforce." As evidence of appellee's bad faith, appellant cited appellee's failure to pay her the $3,000 until such time as appellant signed the proposed order; his failure to comply with court rules and her requests regarding financial information; and his knowledge that Verizon would not honor the settlement provision to maintain her health insurance. She also denied that appellee's proposed order accurately reflected the agreement placed on the record, because it "omits [appellee's] request for restoration of her maiden name." [2]

Further, appellant argued that, pursuant to Md. Rule 9–203(e), appellee should have filed a financial statement with his Answer to her Counterclaim or with his Amended Complaint. In addition, she complained that appellee had repeatedly refused, "during the course of settlement negotiations," to

---

**2.** Appellant's motion did not address the discrepancy between this contention and the averment of her affidavit that she instructed her attorney to insist that the order for the name change be "put into a separate document so I could have some privacy when I went to businesses to change my name."

provide requested financial information. Further, she contended that she "has not been able to and cannot make an informed decision regarding the proposed settlement in this case without full disclosure of [appellee's] financial information." Appellant added that, in the event the case proceeded to trial or a disposition of marital property by the court, "the Court will not be able to make a determination of the property amount of a grant [sic] to either party without a financial statement from [appellee]."

Accordingly, appellant asked the court to dismiss appellee's Motion to Enter; order appellee to file a financial statement pursuant to Md. Rule 9–203(e), or, in the alternative, to dismiss appellee's pleadings for failure to comply with the Rule; and schedule a "settlement conference for parties to present and review the written terms of proposed settlements...." Neither appellant nor appellee requested a hearing on the Motion to Enter, however.

On February 16, 2007, without a hearing on the competing motions, the court issued an Order consisting of the terms of the proposed order submitted by appellee.

## II. DISCUSSION

As noted, appellant filed this appeal before the case was concluded; the merits hearing had not yet been held when the appeal was noted. Neither party has raised the issue of appealability, however. Nevertheless, as Maryland appellate courts have often observed, "[w]hether a matter is appealable is a jurisdictional matter and may be raised by an appellate court even if not noted by the parties." *Gruber v. Gruber*, 369 Md. 540, 546, 801 A.2d 1013 (2002). *See also, e.g., In re Franklin P.*, 366 Md. 306, 326, 783 A.2d 673 (2001); *Office of State Prosecutor v. Judicial Watch, Inc.*, 356 Md. 118, 125, 737 A.2d 592 (1999); *Tharp v. Disabled Veterans Dept.*, 121 Md.App. 548, 557, 710 A.2d 378 (1998). We perceive two potential impediments to appealability; one is easily surmounted, but the other significantly constrains our review.

■ We shall first address the issue of finality. Ordinarily, an appeal may be taken only from a final judgment. Md.Code (2006, 2007 Supp.), § 12–301 of the Courts & Judicial Proceedings Article ("C.J."). In our view, the lack of finality of the court's Order of February 16, 2007, is not a bar to appealability. The Order qualifies as an appealable interlocutory order under C.J. § 12–303(1), because the Order was "entered with regard to the possession of property with which the action is concerned," and/or it qualifies under C.J. § 12–303(3)(v), because the Order concerned "the sale, conveyance, or delivery of real or personal property or the payment of money...." *See Cannon v. Cannon*, 156 Md.App. 387, 393 n. 1, 846 A.2d 1127 (2004), *aff'd*, 384 Md. 537, 865 A.2d 563 (2005); *McCormick Const. Co. v. 9690 Deerco Rd. Ltd. Partnership*, 79 Md.App. 177, 180–81, 556 A.2d 292 (1989).

The second issue of appealability concerns the question of whether the Order is a consent order, despite the fact that it is not labeled as such, and notwithstanding that appellant refused to sign it. Preliminarily, we observe that both parties refer to the Order as a "consent order." For example, appellant argues that "[t]he decision of the Circuit Court to issue the Consent Order constitutes clear error." Appellee maintains that "[t]he Circuit Court did not abuse its discretion when it entered the Consent Order without a hearing over Wife's objections, as the written Consent Order in all respects comports with the terms recited into the record...." Moreover, it is clear that the court below believed that the Order reflected the consent or agreement of the parties. In this regard, we note that the Order does not address the judicial findings and analysis that are mandated by Title 8 of the Family Law Article of the Maryland Code when the court resolves "a dispute between [divorcing] parties with respect to the ownership of personal [or] real property." Md.Code (2006 Repl.Vol., 2007 Supp.), § 8–202(a)(1) & (2) of the Family Law Article ("F.L.").

In *Hearn v. Hearn*, 177 Md.App. 525, 936 A.2d 400 (2007), we observed: " 'Consent judgments are agreements entered into by the parties which must be endorsed by the court.'

They reflect the agreement of the parties 'pursuant to which they have relinquished the right to litigate the controversy.' " *Id.* at 534, 936 A.2d 400 (citations omitted). A consent order has also been defined as "an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court." *Long v. State*, 371 Md. 72, 82, 807 A.2d 1 (2002). *Accord Smith v. Luber*, 165 Md.App. 458, 468, 885 A.2d 894 (2005).

In distinguishing between a consent order and a settlement agreement, this Court said in *Dorsey v. Wroten*, 35 Md.App. 359, 361, 370 A.2d 577 (1977):

> While a settlement agreement is subject to the general rules of contract such as the adequacy of consideration, a consent decree adds a critical element to the contractual act— judicial conclusiveness. A consent decree is entered under the eye and with the sanction of the court and should be considered a judicial act not open to question or controversy in a collateral proceeding. (Internal citations omitted).

In *Dorsey,* the Court determined that an agreement entered on the record in open court is distinct from a settlement agreement that is not entered on the record. There, the parties held "a 'settlement type conference' in the judge's chambers" and, when they reached an agreement, the judge "requested that a consent decree be prepared and presented to him." *Id.* at 360, 370 A.2d 577. Before the draft decree was presented to the judge, however, counsel for one of the parties informed the judge that his client no longer agreed to the terms. *Id.* at 361, 370 A.2d 577. "The trial judge stated that he considered the matter settled and that he would sign the 'consent' decree when it was presented." *Id.* The judge then signed the decree, prompting an appeal.

After reviewing relevant authorities, the *Dorsey* Court determined that the general rule is that "the power of the court to enter judgment by consent is dependent on the existence of actual consent of the parties at the time the judgment is

entered...." *Id.* at 362, 370 A.2d 577. But, of import here, the Court recognized an exception to the rule "where the parties had dictated an agreement into the record and the judge, in open court, had approved the agreement, even though actual judgment had not been entered at the time one of the parties sought to disavow the agreement." *Id.* at 362–63, 370 A.2d 577. The *Dorsey* Court reversed because "it [was] obvious there was no consent [to the settlement agreement] in open court nor was there a written stipulation filed in court." *Id.* at 363, 370 A.2d 577. Nevertheless, the *Dorsey* Court held that "the entry of a judgment by consent implies that the terms and conditions have been agreed upon and consent thereto given in open court or by filed stipulation." *Id. Accord Chernick v. Chernick,* 327 Md. 470, 484–85, 610 A.2d 770 (1992) (rejecting "rule in some other jurisdictions that a consent judgment or consent decree should not be entered unless the consent continues until the moment the court undertakes to make the agreement the judgment of the court").

■ Accordingly, when, as here, "the parties entered into an agreement in open court, which under Maryland law is binding upon the parties," intending that the court will subsequently reduce the agreement to a written order, the legal principles regarding consent orders are "equally applicable" to the resulting order. *Smith,* 165 Md.App. at 470–71, 885 A.2d 894.

■ We next consider the appealability of a consent order. In *Suter v. Stuckey,* 402 Md. 211, 935 A.2d 731 (2007), the Court of Appeals recently addressed the appealability of a consent order in the context of an appeal to the circuit court from a "domestic violence protective order[ ] entered by consent in the District Court...." *Id.* at 221, 935 A.2d 731. After surveying Maryland case law dating from 1848 to the present, and English jurisprudence dating back far further, *id.* at 222–24, 935 A.2d 731, the Court observed: "It is a well-settled principle of the common law that no appeal lies from a consent

decree." *Id.* at 222, 935 A.2d 731.[3] The Court explained, *id.* at 224–25 (internal footnotes and some internal citations omitted):

The rule that there is no right to appeal from a consent decree is a subset of the broader principles underlying the right to appeal. The availability of appeal is limited to parties who are aggrieved by the final judgment. A party cannot be aggrieved by a judgment to which he or she acquiesced.... The rationale for this general rule "has been variously characterized as an 'estoppel', a 'waiver' of the right to appeal, an 'acceptance of benefits' of the court determination creating 'mootness', and an 'acquiescence' in the judgment."

The nature of a consent judgment precludes appeal. Consent judgments "are essentially agreements entered into by the parties which must be endorsed by the court. They have attributes of both contracts and judicial decrees." *Chernick v. Chernick,* 327 Md. 470, 478, 610 A.2d 770 (1992). Like contracts, the parties bargain and provide consideration. Consideration is not always tangible. In the case of a consent judgment, the fact that "the parties give up any meritorious claims or defenses they may have had in order to avoid further litigation" may serve as consideration.

In *Chernick,* this Court addressed the impact of one of the parties' change of mind on a consent order which had been signed and filed with the court. *Chernick,* 327 Md. at 484, 610 A.2d 770. We held that where the underlying bargaining was not unconscionable nor the product of duress, "[t]he fact that one of the parties may have changed his or her mind shortly before or after the submitted consent order was signed by the court does not invalidate the signed consent judgment." *Id.* The contractual nature of the consent decree meant that when there was uncoerced "bargaining for the reciprocal promises made to one anoth-

---

**3.** As the *Suter* Court noted, "[f]or the purposes of this analysis, the terms "judgment," "order" and "decree" are functionally interchangeable." *Id.* at 222 n. 8, 935 A.2d 731.

er" the end product should not be disturbed. *Id.* at 480, 610 A.2d 770.

The public policy of promoting settlement agreements by ensuring finality is another reason to disallow appeals from consent judgments. The Court in *Chernick* pointed to the desirability of settlement agreements that are binding and enforceable. *Id.* at 481, 610 A.2d 770.

Thus, the general rule is that no appeal lies from a consent order. Nevertheless, the *Suter* Court recognized an exception that is relevant here, stating: "The rule is otherwise if there was no actual consent. If there was no actual consent because the *judgment was coerced, exceeded the scope of consent,* or was not within the jurisdiction of the court, *or for any reason consent was not effective,* an appeal will be entertained." *Id.* at 224 n. 10, 935 A.2d 731.

Therefore, an appeal will lie "from a court's decision to grant or refuse to vacate a 'consent judgment' where it was contended below that the 'consent judgment' was not in fact a consent judgment because ... the judgment exceeded the scope of consent, or for other reasons there was never any valid consent." *Chernick,* 327 Md. at 477 n. 1, 610 A.2d 770. In attacking an alleged consent decree under this narrow exception, "[t]he only question that can be raised ... is whether in fact the decree was entered by consent." *Dorsey,* 35 Md.App. at 361, 370 A.2d 577. *See also Mercantile Trust Co. v. Schloss,* 165 Md. 18, 24–25, 166 A. 599 (1933); *Casson v. Joyce,* 28 Md.App. 634, 636–38, 346 A.2d 683 (1975); *Prince George's County v. Barron,* 19 Md.App. 348, 349, 311 A.2d 453 (1973).

In essence, appellant argued below, as she does on appeal, that she did not consent to the terms of the Order issued by the court. Our review is confined to whether the circuit court erred in entering the Order. Put another way, we must examine from the record the core question of whether appellant consented to the terms of the Order.

Appellant insists that "the settlement agreement is invalid because it does not represent a meeting of the minds of the

parties to the agreement and was not entered into by the Appellee in good faith." She explains that the parties only discussed the terms of the settlement with their attorneys "for approximately 10 minutes prior to the settlement hearing." In appellant's view, appellee's "egregious and intentional omission" to "provide Appellant and the Court with the necessary financial information to make a proper determination of the marital assets ... demonstrates the Appellee's failure to negotiate in good faith and lack of candor with the trial court."

Moreover, appellant maintains that "[t]he transcript of the settlement hearing does not include any statements wherein the Appellant waived her rights to all other portions of the Appellee's retirement plans...." Yet, to appellant's dismay, "the Consent Order waives her rights to all other property which is not mentioned in the order." She states:

> During the settlement hearing, there was no specific discussion [of] the Appellee's retirement package or any specific type of benefits that were excluded from distribution.... The waiver of a 401K, stock option, profit sharing, or other pension benefit was never discussed during the settlement hearing, between the parties just prior to the hearing, or by the Court.

Therefore, appellant challenges "the waiver portions of the Consent Order and its limitation to the Appellee's 'pension,' and the condition that the Appellee would cooperate with the Appellant 'if Verizon is inclined to allow the [Appellant] to continue to receive health insurance through Verizon.'"

Similarly, appellant asserts: "Other drafts of the settlement agreement prepared by the Appellee's attorney contain different terms and explicit waivers that are not included in either the transcript of the hearing" or the Order. She claims that it was only "[s]ubsequently upon further discussions with the Appellee's counsel, [that] the Appellant's counsel discovered that the Appellee intended to have the Appellant waive her rights to all other retirement benefits except the Appellee's pension."

"The most compelling evidence," in appellant's view, "that the Consent Order is not a result of the agreement of the parties is the Affidavit of the Appellant that was attached to the Appellant's Response to the Motion to Enter." In the affidavit appellant identified the "portions of the hearing that created ambiguities in her mind" regarding the provision for her share of appellee's "pension" as well as the health insurance provision.

Appellee counters that appellant "is mistaken" in suggesting "that there is a clear difference between the terms of the documents of the purported agreement as stated in the transcript, the terms stated during negotiations, and the terms in the consent order." He asserts:

The terms which were placed on the record in open court are the same terms that are recorded in the transcript, and that are written in the consent order. Any terms discussed during negotiations or a settlement conference are of no account once a final agreement is put on the record.

\* \* \*

It is the responsibility of the parties' attorneys (and not the court) to make certain that their client(s) fully understand the terms of any consent agreement, and that they have the information that they require to make good choices, prior to entering into any consent agreement. If a party has concerns about the information (s)he has available, the time to do research is prior to consenting—not afterward. Once the agreement is made and placed on the record by the parties, under ordinary circumstances no further formal discovery into the matter is possible.

Furthermore, appellee maintains that there was a meeting of the minds, and that "both parties voluntarily consented to the terms as stated." He alleges:

At all times relevant, Wife was aware that Husband had a pension account at Verizon and other investment account(s) there; but, Wife nevertheless agreed to accept an award of her marital share of Husband's Verizon pension only. Fur-

ther evidence of the meaning of the parties' agreement exists in the record, as the pension distribution was described as "if, as, and when he receives it pursuant to the Bangs Formula"—an apt description of the usual mode of distribution of a pension (but not the usual mode of distribution of a 401(k) account, for example).

As to the payment of Wife's health insurance premiums, the record clearly demonstrates agreement that Husband was to pay Wife's premiums only until time of absolute divorce, and thereafter that Wife was to bear the cost of her own premiums. Wife disingenuously now asserts that she thought the contrary was true.

Appellee continues:

[T]he parties, by and through their respective counsel, negotiated an agreement at a court proceeding, which agreement completely resolved their issues of marital property and the issue of health insurance for Wife. The terms of the agreement were recited on the record in open court before the Master for Domestic Relations, by Husband's attorney. When asked by the Master whether she had anything to add, Wife's attorney stated that she did not. Both parties were *voir dired* on the record and voiced their complete assent thereto.

· . . . Wife and her attorney were aware of the nature of the marital property to be distributed, including Wife's business and Husband's "pensions, stock options and other annuities from his employment at Verizon." [Quoting letter of appellant's counsel, Appellee's Appx at 1]. . . . [N]o formal discovery requests had been filed by either side, but both parties (and their counsel) were comfortable enough with the information that they had to voluntarily make a full marital property agreement on the record. When given an opportunity by the Master to voice any concerns, Wife's attorney stated on the record that nothing was left out, and that that was her understanding of the agreement.

. . . [A] proposed consent order was drafted by one of the attorneys. . . . [It] comported exactly with the agreement

put on the record by the parties. Nevertheless, Wife refused to execute it.

(Internal citations and footnote omitted.)

In support of his position, appellee relies on *Smith v. Luber,* *supra,* 165 Md.App. 458, 885 A.2d 894, contending that it is the "controlling case under our facts." We turn to review that case.

In *Smith,* as in the case at bar, the litigants "reached an agreement as to ... issues [in] the litigation [which was] entered into the record in open court." *Id.* at 465, 885 A.2d 894. The parties were each "asked qualifying questions about their acceptance of the agreement on the record and both acknowledged their acceptance." *Id.* "The court accepted the agreement and requested appellee's counsel to reduce the agreement to writing and submit it to the court as a Consent Order." *Id.* at 468, 885 A.2d 894. Nevertheless, when one party drafted a written version of the proposed agreement, the other balked at signing it, maintaining that it failed to accurately reflect the agreement entered on the record. *Id.* at 465, 885 A.2d 894. The order was redrafted, but the parties still could not agree that it accurately reflected their earlier accord. *Id.* at 465–66, 885 A.2d 894. The court ultimately executed the "Order of Court Reflecting Agreements," despite the objection of one of the parties, who then appealed to this Court. *Id.*

Upon surveying our precedents on consent orders, the Court made the following observations, *id.* at 470–71, 885 A.2d 894 (some internal citations omitted; emphasis added):

Consent judgments have attributes of both contracts and judicial decrees. "A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." The contractual aspects of a consent judgment are as important as the attributes associated with it being a judicial decree.

The Court of Appeals has said "the consent judgment memorializes the agreement of the parties, pursuant to which they have relinquished the right to litigate the controversy in exchange for a certain outcome and/or, perhaps expedience." The Court explains:

It is the parties' agreement that defines the scope of the decree. . . . Where the agreement is embodied in the judgment without modification, construction of the judgment is construction of the agreement of the parties. Where, however, as here, the court has modified the agreement, we look to the agreement as submitted by the parties.

**This is equally applicable where the parties entered into an agreement in open court, which under Maryland law is binding upon the parties,** *see Chertkof v. Weiskittel Co.,* 251 Md. 544, 550, 248 A.2d 373 (1968) [*cert. denied,* 394, U.S. 974 (1969) ]; *Dorsey v. Wroten,* 35 Md.App. 359, 363, 370 A.2d 577 (1977), and the court, in reducing the agreement to writing, has subsequently modified that agreement.

In Maryland, the objective law of contracts is followed when interpreting the language of a contract. *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985). **Therefore, when the language is clear and unambiguous "we must presume that the parties meant what they expressed," leaving no room for construction.** *Id.* (Boldface added.)

In *Smith,* however, we concluded that the order entered by the court did not accurately reflect the agreement of the parties. Therefore, we remanded for revision of the order. *Smith,* 165 Md.App. at 479, 885 A.2d 894.

We agree with appellee that *Smith* speaks directly to this case. We also agree that appellant's claims are without merit. Although appellant contends that the Order issued by the Court differs from the agreement set forth by the parties on the record, the language of the Order tracks the language of the agreement almost verbatim.

In particular, appellant has alleged three differences between the terms articulated at the hearing and the text of the Order. We pause to review the alleged differences.

First, with respect to appellee's retirement benefits, the agreed provision at the hearing was that "Mrs. Barnes will receive *the marital share of Mr. Barnes' pension with Verizon* if, as, and when he receives it pursuant to the Bangs Formula." (Emphasis added.) The Order provides "that [appellant will] receive *her marital share of the Plaintiff's pension with Verizon,* if, as, and when received by the Plaintiff, pursuant to the BANGS formula." (Emphasis added.) The court's Order uses terms identical to those agreed to by appellant on the record at the hearing.

Second, appellant contends: "The transcript of the settlement hearing does not include any statements wherein the Appellant waived her rights to all other portions of the Appellee's retirement plans, but the Consent Order waives her rights to all other property which is not mentioned in the order." To the contrary, and as we have seen, appellee's counsel stated at the hearing that "the parties have agreed that they have *resolved all of their marital property issues* . . . ." (Emphasis added.) After detailing the agreed terms, appellee's attorney also stated: "[E]ach party will keep all other property which is in their possession *with no right of claim to any property . . . not otherwise mentioned.*" (Emphasis added.) Appellant was voir dired and expressly indicated that she had so agreed.

Consistent with the terms as outlined at the hearing, the Order provides that "this Agreement *resolves all marital property issues* " and, after detailing the agreed terms, it states that "all other property has been divided to the satisfaction of the parties and *each shall keep all other property which is in their possession and which is not otherwise mentioned herein, with no right of claim by the other.*" (Emphasis added.) There is no daylight between the agreed statement in the hearing and the terms of the Order.

With regard to health insurance, the parties agreed as follows at the hearing:

"Mr. Barnes will continue Mrs. Barnes on his health insurance through Verizon *through the marriage.* And ... will *cooperate with Mrs. Barnes if Verizon is inclined to allow her to continue* to stay on the health insurance ... *with the understanding that Mrs. Barnes will be responsible for payment of the health insurance following divorce.* (Emphasis added).

Correspondingly, the Order provided:

ORDERED, that the Plaintiff continue the Defendant on his health insurance through Verizon *until the date of absolute divorce* and the Plaintiff shall *cooperate with the Defendant if Verizon is inclined to allow the Defendant to continue* to receive health insurance through Verizon. *The Defendant shall be solely responsible for payment of her health insurance following the date of absolute divorce.* (Emphasis added).

In sum, appellant's suggested distinctions between the agreement and the Order are entirely illusory. We cannot say the circuit court erred in issuing the Order as written. The Order is, in fact, entirely consistent with the oral agreement.

In *Casson v. Joyce,* 28 Md.App. 634, 638–39, 346 A.2d 683 (1975), this Court recognized that Maryland adheres to the "English practice" of dismissing an appeal where the order at issue on appeal is found to be a properly entered consent order. There, "counsel of record for the parties advised the court that an agreement had been reached and read the agreement into the record. In part, the agreement declared that a consent judgment be entered [against Casson] for $5,500.... Judgment was entered as agreed." *Id.* at 635, 346 A.2d 683. Casson herself was not present in court. *Id.* Casson appealed, *pro se,* contending that her attorney lacked authority to consent to the judgment. Notably, we dismissed the appeal. *Id.*

The Court began its analysis by noting that Maryland "has never deviated from the rule that no appeal will lie from a

consent decree." *Id.* at 636, 346 A.2d 683. It said, *id.* at 638, 346 A.2d 683 (emphasis in original):

> In the case at bar the file contains, *but the record does not include,* what purports to be a letter supporting appellant's ... contention. Unless the *record* contains that or other evidence of lack of authority by the attorney (which is most unlikely in any case) we may not go beyond it for additional facts.

To be sure, the Court acknowledged that courts of some jurisdictions, including the Supreme Court, would affirm, rather than dismiss, in such a case. We quoted *Swift & Co. v. United States,* 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928), as an example:

> "Under the English practice a consent decree could not be set aside by appeal or bill of review, except in cases of clerical error.... In this Court a somewhat more liberal view has prevailed. Decrees by consent have been reviewed upon appeal or bill of review when there was a claim of actual lack of consent to the decree as entered, ... or of fraud in its procurement ... or that there was a lack of federal jurisdiction.... But 'a decree which appears by the record to have been entered by consent, is always affirmed, without considering the merits of the case.'"

*Casson,* 28 Md.App. at 637–38, 346 A.2d 683 (quoting *Swift,* 276 U.S. at 323–24, 48 S.Ct. 311 (citations omitted in *Casson* )).

The *Casson* Court concluded, however, that "it is clear that Maryland follows the English practice" of dismissing, rather than affirming, an appeal from a decree that appears by the record to have been entered by consent. *Casson,* 28 Md.App. at 638, 346 A.2d 683. We explained that the case at bar was an example of the wisdom of Maryland's approach, *id.* at 638–39, 346 A.2d 683:

> The English practice followed in Maryland seems more straightforward, founded on better reason and less drastic. If coupled with the requirement ... that the attack be made below ... it would seem preferable to hold there is no appeal rather than permitting appeal without considering

the merits. This remedy permits judicial review of the attorney's authority when that question is raised propitiously below.

\* \* \*

Because we have dismissed this appeal rather than having heard its merits ... if the lower court decides to hold a hearing [on the issue of the attorney's authority] appellant may submit such evidence for the record as she may have of lack of authority by her attorney to have consented to the judgment. The determination may then be made by the court, on the merits ... utilizing evidence which is not now properly before us on this appeal.[4]

█ In this case, as in *Casson,* the Order on review is entirely consistent with the oral agreement entered by the parties on the record. Because there is no evidence on the record to contradict the conclusion that both parties voluntarily agreed to the terms of the Order, we shall dismiss the appeal.

Nevertheless, in dismissing this appeal, it is important to note what we are *not* deciding. We are not deciding several of appellant's contentions, as they are inapposite to the limited questions before us—whether the terms of the Order reflect the parties' agreement, and whether appellant consented to the terms. *See Dorsey,* 35 Md.App. at 361, 370 A.2d 577. We shall briefly identify appellant's contentions.

█ First, appellant contends that the term "pension," as used in the Order, is ambiguous. She states: "[A] reasonably prudent person could interpret that term to include all of the Appellee's retirement benefits or only the deferred compensation plan." Citing *Bellofatto v. Bellofatto,* 245 Md. 379, 386, 226 A.2d 313 (1967), she maintains that "the ambiguous

---

4. In *Casson,* the appellant had also filed in the circuit court a timely motion to vacate the judgment on the ground of the attorney's lack of authority to consent. We reasoned that, in light of our dismissal, "the motion may stand for hearing as though no appeal had been entered." 28 Md.App. at 639, 346 A.2d 683 (emphasis omitted). The record here does not disclose the filing of such a motion.

portions of the Consent Order [must be construed] against the Appellee because it was drafted by Appellee's attorney."[5] But, even assuming that the language of the Order is ambiguous, it is not our function, within the scope of this appeal, to construe the terms of the parties' agreement and resolve ambiguities in its language. Although that may be necessary to an ultimate determination of what the term "pension" *means* in the context of the parties' agreement, it has no bearing on the limited issue before us, which is whether appellant consented to the Order, including the term "pension." That is perhaps an issue for another day.[6]

Additionally, appellant devotes significant consideration to the argument that "the Court ignored a critical fact brought to its attention in the Appellant's motion: the Appellee had not followed the Court's own rules regarding filing financial information." Appellant notes that Maryland Rule 9–202(e) (2007) requires each party to file a current financial statement with the pleadings. The form of the required statement is set forth in Rule 9–203(a). Citing *Lowery v. Lowery*, 113 Md.App. 423, 688 A.2d 65 (1997),[7] appellant insists that the circuit court should not have issued the Order

---

5. Appellee suggests, without citation to authority, that *Bellofatto* has been superseded by statute. Appellee does not specifically suggest, however, that the proposition for which appellant cites *Bellofatto* is no longer good law. But, even assuming that *Bellofatto* would be dispositive of appellant's ambiguity argument, the argument is not properly before us.

6. Our disposition of this appeal does not necessarily foreclose a declaratory action seeking judicial construction of the terms of the Order, such as the term "pension." *See, e.g., Dennis v. Fire & Police Employees' Retirement System*, 390 Md. 639, 656, 890 A.2d 737 (2006) ("In interpreting the parties' agreement as embodied in a consent judgment, we have applied the ordinary principles of contract construction.").

7. We note that *Lowery*, a divorce case, concerned neither a consent order nor a financial statement under Rule 9–202(e). Rather, the case concerned the determination of whether property was marital or non-marital. In our view, appellant has embellished quotations from our opinion in *Lowery* and mischaracterized its facts and holding, suggesting that *Lowery* stands for the proposition that the entry of a settlement agreement does not obviate the need for further discovery. In fact,

in the absence of a financial statement filed by appellee, as required by Rule 9–202(e), because "it is more than a question of fact as to which of the Appellee's retirement benefits constitute marital property, but a question of law as to why the Circuit Court for Charles County did not require the Appellee to follow the Court's rules regarding disclosure of financial information."

Whether appellee filed a financial statement is wholly irrelevant to whether the parties reached an agreement embodied in the terms of the Order. Although appellant might have been well advised to withhold her consent until she received such information, she opted not to do so. Instead, in open court on August 1, 2006, appellant voluntarily entered into a settlement agreement with appellee, well aware that she had not received a financial statement from appellee. Similarly, whether appellee supplied appellant with financial information in advance of her consenting to the settlement had no bearing on whether the court's Order of February 16, 2007, accurately reflected the terms to which the parties had agreed.

Throughout her brief, appellant cites divorce cases involving contested issues of marital property that were resolved by the

there was no settlement agreement in *Lowery,* and our comment regarding discovery pertained to the opportunity for further discovery upon a remand for reconsideration of factual findings. *Lowery,* 113 Md.App. at 439, 688 A.2d 65.

In a similar vein, appellant cites *Ross v. Ross,* 327 Md. 101, 607 A.2d 933 (1992), to support the proposition that "trial courts should do more than adopt property agreements between divorcing parties...." There is no language in *Ross* to endorse that proposition, even by implication. In *Ross,* there was no agreement between the parties. *Ross* involved exceptions to the findings and recommendations of a master, and concerned a judge's failure to "render an opinion resolving any challenge to the master's findings of fact and reflecting 'consideration of the relevant issues and the reasoning supporting the chancellor's independent decisions on those issues.'" *Id.* at 104, 607 A.2d 933 (internal citation omitted).

Additionally, appellant cites *Woodall v. Woodall,* 16 Md.App. 17, 293 A.2d 839 (1972), for the proposition that, "[w]here discrepancies exist regarding specific aspects of the property settlement in a divorce case, it is proper to reverse and remand the case for further proceedings." Once again, there was no settlement agreement in *Woodall.*

court, rather than cases involving consent orders. *See, e.g., Deering v. Deering,* 292 Md. 115, 437 A.2d 883 (1981); *Lowery, supra,* 113 Md.App. 423, 688 A.2d 65; *Falise v. Falise,* 63 Md.App. 574, 493 A.2d 385 (1985). Moreover, she argues as if the Order represents a determination of marital property issues by the court. For example, citing *Falise,* appellant contends that, "[i]n order for the parties to a settlement agreement to exclude portions of marital property, the parties must provide in the agreement that the subject property is nonmarital or other terms that specifically exclude the property." But, an agreement to exclude marital property is only relevant if the *court* must make a determination of what property is marital, *see* F.L. § 8–203, which, in turn, will only occur if the court must resolve a "dispute between the parties with respect to the ownership of . . . property." F.L. § 8–202. By agreeing to settle the marital property issues in this case, the parties obviated the need for the court to resolve any such disputes. *See* F.L. § 8–101(b) ("A husband and wife may make a valid and enforceable settlement of alimony, support, property rights, or personal rights."). *See also, e.g., Gordon v. Gordon,* 342 Md. 294, 300–301 (1996) ("The prevailing view is now that 'separation agreements . . . are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy.' ") (citation omitted); *Bruce v. Dyer,* 309 Md. 421, 438, 524 A.2d 777 (1987) ("[T]he validity of [property settlement] agreements [between spouses] has long been judicially recognized in Maryland."); *Rauch v. McCall,* 134 Md.App. 624, 637, 761 A.2d 76 (2000), *cert. denied,* 362 Md. 625, 766 A.2d 148 (2001).

In appellant's own words, the purpose of a financial statement under Rule 9–202(e) is "to provide *the trial court* with the information necessary to form a factual basis for its decision regarding marital property, the definition of marital property, and its valuation." (Emphasis added). Appellant fails to appreciate that the issuance of the Order was not a resolution by the court of any dispute as to marital property. Rather, it was the entry of an Order effectuating the parties' agreement. The only way in which the court could err in

entering the Order was to enter an order to which the parties had not actually agreed. Accordingly, appellee's failure to file a financial statement, and the circuit court's failure to require appellee to do so prior to issuing its Order, are not before us on review.

Appellant also contends that, *"[s]ubsequent to the issuance of the Consent Order,* the Appellant obtained an opinion from the Appellee's employer, Verizon, that the Consent Order does not qualify as a QDRO and that Verizon will be [un]able to award a portion of the Appellee's plan without a QDRO." (Emphasis added.) Appellant's argument that the Order does not satisfy the requirements of a Qualified Domestic Relations Order ("QDRO") is similarly irrelevant to the issue of whether appellant agreed to the terms of the Order.

A QDRO is a creature of federal employee benefits law. We described QDROs in *Jenkins v. Jenkins,* 112 Md.App. 390, 397 n. 3, 685 A.2d 817 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997) stating:

QDRO's or Qualified Domestic Relations Orders are orders of a domestic relations court that come under an exception to the spendthrift provisions of ERISA (Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461). The ERISA provisions generally prevent the assignment or distribution of the proceeds of an ERISA qualified plan to third parties. A domestic relations order meeting certain qualifications (hence the QDRO moniker) for support or distribution of property may, however, require the allocation of all or part of a plan participant's benefits to an alternate payee. Use of this ERISA exception allows state trial courts effectively to alter title to otherwise untouchable pension plans without violating federal law.

Because "ERISA expressly preempts state law and made the regulation of pension plans a matter of exclusive federal interest," *Eller v. Bolton,* 168 Md.App. 96, 107, 895 A.2d 382 (2006), most employee pension plans are subject to ERISA's requirements. Therefore, in most circumstances, "[a] QDRO is required to transfer pension benefits from one

beneficiary to another, either pursuant to the Marital Property Disposition Act, or through an attachment in aid of a support obligation." *Janusz v. Gilliam,* 404 Md. 524, 538, 947 A.2d 560 (2008). Notably, "[a] QDRO can be 'either collateral to a judgment as an avenue for enforcement or it can be an integral part of the judgment itself.'" *Janusz,* 404 Md. at 538, 947 A.2d 560 (quoting *Potts v. Potts,* 142 Md.App. 448, 459, 790 A.2d 703, *cert. denied,* 369 Md. 181, 798 A.2d 553 (2002)).

In order to be valid as a QDRO, a domestic relations order must meet the conditions set forth in 29 U.S.C.A. § 1056(d)(3)(C) (1998, 2008 Supp.):

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

To be sure, the Order entered by the court does not meet these conditions. Nevertheless, the Order's failure to conform to the technical requirements for qualification as a QDRO has no bearing on whether appellant consented to the Order's terms. We underscore, however, that appellee is clearly obligated to obtain a QDRO to effectuate the agreement of the parties, as expressed in the Order of February 16, 2007. In the event that he fails to cooperate in doing so, appellant would be entitled to seek recourse with the court.

In *Eller, supra,* 168 Md.App. 96, 895 A.2d 382, we affirmed a circuit court's order "amending [an] original QDRO to reflect the parties' intent, as expressed in [a] Consent Order, and which they intended to provide for in the QDRO," even

when entered after the judgment of divorce. *Id.* at 118, 895 A.2d 382. In that case, the court had incorporated, but not merged, the parties' consent order with the judgment of divorce, *id.* at 101, 895 A.2d 382, and had ordered that the court would " 'retain jurisdiction over this matter ... to modify the Order so as to make it a Qualified Domestic Relations Order that reflects the parties' intent, said modification order to be entered *nunc pro tunc,* if appropriate.' " *Id.* at 103, 895 A.2d 382 (quoting circuit court's order). To our knowledge, no judgment of absolute divorce has yet been rendered; appellant is in no danger of forfeiting her claim to a valid QDRO.

 Moreover, there is another reason why appellant's QDRO argument is not properly presented for appellate review: appellant did not make the argument to the court below, either in her Response to Motion to Enter or at any other time. Therefore, it is not properly before us. *See Steinhoff v. Sommerfelt,* 144 Md.App. 463, 482–83, 798 A.2d 1195 (2002) (determining that parties' complaint that circuit court did not enter a QDRO was not preserved, because "[p]rior to filing his final Opinion and Order, [the judge] was never asked to consider the subject. There is before us, therefore, nothing preserved for appellate review.").

**APPEAL DISMISSED. COSTS TO BE PAID BY APPELLANT.**